J. Irwin Shapiro, J.
Plaintiff purchased a box of nails from a lumber and hardware supply company, defendants Macrose Lumber & Trim Co., Inc., or Macrose Industries, Inc. (Macrose) which by stipulation are to be treated as one entity. He was injured as a result of the alleged shattering of the very first nail used by him and he brings this action to recover damages for those injuries. The nails were manufactured by Amagasald Nail Works, Ltd., Amagasald, Hyogo, Japan (not a party .to this action) and sold by it to defendant Nissho American Corp. (Nissho American) which in turn resold them to a supplier, Wilmod Company, Inc. (Wilmod) which thereafter resold them to another distributor who resold them to Macrose. Plaintiff joined Wilmod as a defendant along with Macrose, alleging that Wilmod manufactured the nails.
The nails were in fact manufactured in Japan by Amagasald according to Wilmod’s specifications and were shipped by it in boxes designed by Wilmod directly to Wilmod, which placed certain labels on .the individual boxes of nails and resold them to other distributors. Plaintiff proceeded against Macrose and Wilmod on the theories of breach of warranty, express and implied, and negligence.
Macrose interposed a cross claim against Wilmod in which Macrose sought recovery from Wilmod for any judgment against it.
Wilmod then impleaded Nissho American, as a third-party defendant, on .the theory that Nissho American sold and delivered the nails to Wilmod and that if Wilmod were negligent in connection with the nails, its negligence was passive, whereas Nissho American’s negligence was affirmative and, therefore, it would be entitled to a recovery over against Nissho American. As a second cause of action in the impleader complaint, Wilmod stated that Nissho American warranted the nails as suitable for *549 the use made of them by plaintiff; that Wilmod relied on said warranty and that Nissho American breached the warranty and is responsible to Wilmod for any sum Wilmod would have to pay as a result of a judgment against it in plaintiff’s favor. The court finds as a fact that Nissho American ordered the nails from the manufacturer Amagasald at Wilmod’s request but that said nails were shipped directly to Wilmod and were never in the physical custody of Nissho American.
Plaintiff testified that in the early afternoon of August 20, 1962, he purchased a sealed box of nails at a lumber and hardware store operated by Macrose and that he had never before purchased masonry nails. He said that he informed the Macrose salesman that he was in the process of finishing his basement and intended to place paneling over the hard concrete walls and that the salesman told him that ‘‘1 should place some Stud material along the concrete wall about two feet apart and then hammer these in with nails, and with that he gave me a box of nails and that these are the type of nails I would use.” Plaintiff further testified that he was directed by the salesman to put up studding and then nail it to the concrete wall and then nail the panels to the studding and that all nailing was to be done with the nails which plaintiff testifies were given him by the salesman for this particular purpose. It is undisputed that on the top of the box of nails sold to plaintiff appears the following legend:
“MASONRY NAILS
HARDENED STEEL
(picture 2½" .148 A"
of nail) ONE POUND NET
NAILS UNLIMITED ”
and that on the bottom of the box appeared the words,
“ ONE POUND NET
MFRD IN JAPAN
FOR
WILMOD CO. NYC ”
Plaintiff testified that there were no directions inside the box whereas the witnesses for Macrose, Nissho American and Wilmod testified that the manufacturer, as directed by Wilmod, was supposed to insert a slip of instructions in each box which read: ‘ ‘ Directions: Hardened masonry nails can be hammered into mortar, cinder blocks and other comparatively soft masonry in the same way as ordinary nails are hammered into wood. When they are to be used in concrete, brick or other hard substances, it is necessary to first drill a hole about % of the length of the nail.”
*550 Plaintiff testified that in the afternoon of August 30, 1962 he opened the box of masonry nails and hammered one of them to a point about % inches into the 1-inch stud; that he then picked up the stud and placed it against the concrete wall of the basement and hammered the nail head into the stud and that as the nail made contact with the concrete wall an object flew back and struck him in his right eye. I find as a fact that the object was the head of the nail which had split off from its body.
A substantial portion of the trial was devoted to hearing the testimony of experts on the question of whether the other nails in the box purchased by plaintiff from Macrose were defective. The plaintiff produced as an expert witness a licensed professional engineer who testified that he tested the nails for hardness and found that they were fairly uniform in hardness down the length of the nail; that he had bent the nails and one nail ruptured after 60 degrees of bending and another was bent through 90 degrees without rupture. He further testified that tests were performed by driving the nails into concrete and that two of the nails so driven shattered and ruptured at a point approximately half way up the length because the nails were extremely hard and brittle, brittleness being a measure of the shatterability of the nail. In his opinion the nails were not proper for use in concrete. He stated that a concrete nail, properly manufactured, should be so constituted that only the tip should be hard for penetration and that the rest of it should be softer to reduce the brittleness and that the proper way .to accomplish this would be to take the hardened nail and heat-treat all but the very tip. He further stated that the nails he examined did not conform to American standard nails manufactured for use for masonry and concrete and that the American nails which he had tested were all annealed in the upper half of the nail whereas the nails in question in this litigation were not.
Wilmod called no expert witnesses and through its vice-president conceded that it had never made formal tests of the nails but that it occasionally took sample nails and drove them into oak pallets but not into masonry or concrete.
The third-party defendant, Nissho American, produced as an expert witness a metallurgist engineer who testified that at his direction various tests were made on the nails. He found that the nails were uniformly hard and testified that this was normal for a masonry nail and that the tip of a masonry nail should not be harder than the rest of the nail and that he knew of no American nail where there is any difference in the *551 hardness between the tip and the balance of the nail. He testified that there was sufficient ductility (bendability) in the nails and that the nails he tested compared favorably with the requirements and standards of masonry nails manufactured in the United States. He admitted that he did not test the nails by driving them directly into concrete nor did he test them by driving them into concrete into which a hole for the nail had been predrilled. He did testify, however, that the predrilling of a hole, as directed by the instructions allegedly placed in each box of nails, would tend to reduce the shatterability of the nail being hammered into concrete.
In addition to any facts heretofore found the court finds the following to be the facts:
1. The injury to plaintiff’s eye was caused by the nail head shattering from the rest of the nail when plaintiff hammered it into concrete which was not predrilled;
2. The box of nails purchased by plaintiff did not contain an instruction sheet stating the procedure to be used when the nails were driven into concrete; and
3. Plaintiff did not make known to Macrose or any of its agents the particular purpose for which he purchased the nails, i.e., to drill them into concrete, nor was he given any instructions by them as to the manner in which the nails should be used.
RIGHTS IN WARRANTY BY SCHWARTZ V. MACROSE
The rights of the plaintiff against Macrose on the warranty causes of action are governed by the Personal Property Law, since this transaction occurred prior to the effective date of the Uniform Commercial Code. (See Uniform Commercial Code, § 10-101.)
Plaintiff is not entitled to recover from Macrose on the theory of breach of express warranty, since this court has found that the seller made no express warranties. Nor is plaintiff entitled to recover on the theory of breach of implied warranty that the nails were fit for a particular purpose (Personal Property Law, § 96, subd. 1), since this court has found that the plaintiff did not expressly or by implication make known to Macrose “ the particular purpose for which the goods” were required.
The question, therefore, is whether plaintiff has a right to recover on the implied warranty of merchantability which is implied in the sale by subdivision 2 of section 96 of the Personal Property Law which states that “ Where the goods are bought by description from a seller who deals in goods of that *552 description * * * there is an implied warranty that the goods shall be of merchantable quality.”
There can be no question that the nails were “bought by description ” since the plaintiff did not select the product from the retailer’s shelf but, rather, was supplied with them by the retailer’s salesman in response to his request for a package of nails. The basic question boils down to whether the nails were of merchantable quality. The implied warranty of merchantable quality means that the article is reasonably fit for the ordinary uses for which it was manufactured. (See Prosser, The Implied Warranty of Merchantable Quality, 27 Minn. L. Rev. 117,130.) The nails purchased by plaintiff were ‘ ‘ masonry nails ’ ’ and it seems elementary that the plaintiff used the offending nail for a purpose for which it was manufactured. The courts have stated that merchantable means that a product attains a standard of “ at least a medium quality of goodness ”. (Empire Cream Separator Co. v. Quinn, 184 App. Div. 302.) Perhaps the best definition of the elusive concept of merchantability is that set forth in Williston on Sales (Vol. 1, § 243, pp. 641-642) where, the author states: “ The requirement when it exists that goods shall be merchantable does not require that the goods shall be of first quality or even that they shall be as good as the average of goods of the sort. In some cases it is indeed said that goods must be of ‘medium quality,’ but this seems to go too far. On the one hand it is not enough that the article is such as would in ordinary parlance be called by the name which the buyer and seller used to describe it, but, on the other hand, if there is no warranty of fitness for a particular purpose the buyer cannot claim more than that the goods with their defects known shall be salable as goods of the general kind which they Avere described or supposed to be when bought; or shall be reasonably suitable for the ordinary uses for which it was manufactured.” (Emphasis supplied.)
After a most careful scrutiny of the entire record I find that the nails sold by Macrose did not meet the standard tests of merchantability in that they were not of “medium quality” and that they were not reasonably suitable for the ordinary uses for which they were manufactured. In Hessler v. Hillwood Mfg. Co. (302 F. 2d 61), a similar case but involving different parties, the court reached a similar result. That was an action by a New York hardware retailer against an Ohio nail manufacturer to recover the amount of a judgment rendered on a theory of breach of implied warranty of merchantability by a New York court and paid by the retailer to a buyer who was injured by a defective concrete nail. The court found that the *553 judgment in the New York action was not conclusive in the Federal suit brought by the retailer but that since the retailer in the Federal suit offered independent evidence as to all essential elements of the case he was entitled to recover from the manufacturer because the nail manufactured for use in nailing wood to concrete was not reasonably fit for that purpose and was not, therefore, under the New York law of sales, of a merchantable quality. Here, as in that case, the evidence preponderates in support of a finding that the nail was defectively manufactured.
Since directions for use in concrete were not contained in the box of nails purchased by the plaintiff, his use of the warranted article was not patently careless and improvident. (See Poretz v. Macy & Co., 119 N. Y. S. 2d 211.)
RIGHTS IN' WARRANTY BY SCHWARTZ V. WILMOD
Plaintiff seeks to recover against Wilmod on the theory of breach of warranty, both express and implied. Since Wilmod did not advertise the product or in any way make any affirmative statements regarding its quality, there can be no express warranty; nor do the facts establish a warranty of fitness for a particular use. The fundamental question, therefore, is whether a supplier in the position of Wilmod is liable to a consumer with whom it is not in privity of contract for a breach of implied warranty of merchantability.
In answering this question in the negative Wilmod relies on Vulpis v. City Line Lbr. Co. (39 Misc 2d 842, affd. without opn. 19 A D 2d 947) and on the proposition that the landmark decisions of the Court of Appeals in this area, including Goldberg v. Kollsman Instrument Corp. (12 N. Y. 2d 432), neither warrant nor compel a finding for plaintiff on this cause of action.
In Vulpis (supra) plaintiff was injured by a defective nail and brought an action against the retailer City Line Lumber Co. The nail had been manufactured by Amagasaki Nail Works, Ltd., aiid sold by the manufacturer to Nissho Co., Ltd., of Osaka, Japan, which resold them to Nissho American, which resold them to Zinman (whose trade name was Wilmod Co.). Zinman thereafter resold them to Building Materials Distributors, Inc., which distributed them to the retailer.
The decision in Vulpis (supra) was on a motion for summary judgment by Nissho American to dismiss the fourth-party complaint interposed against it by Building Materials which sought recovery on the theory, inter alia, that Nissho American had breached its warranty of merchantability to it.
*554 As can be seen from the statement of facts, Nissho American and Building Materials Distributors, Inc., were not in privity of contract. The court noted that nowhere on the box of nails did Nissho American’s name appear, nor did the box contain any warranties or representations by it. Said the court (p. 844): “ It may be true that the Court of Appeals ‘ has dispensed, without qualification, with the court-made traditional requirement of privity ’ (Williams v. Union Carbide Corp., 17 A D 2d 661, 662) in actions for breach of warranty. It is not yet the law, however, that one distributor may maintain an action for breach of express or implied warranty against another distributor not in privity with the first who neither manufactured the article in question nor advertised it nor made any representations whatsoever with respect to it, nor even marked it with his name or trade-mark. Moreover, there is no reason to hold that justice requires such a rule.”' Therefore, it granted the motion for summary judgment.
The thrust of Wilmod’s argument is that since the court in Vulpis (supra) held that a distributor could not recover from another supplier where there was no privity of contract between them, plaintiff in this case, although a consumer, should not be allowed to recover from it, a supplier, because he is even further removed and further along in the chain of privity than was the third-party plaintiff, Building Distributors, which could not recover in Vulpis (supra).
This ease is readily distinguishable from Vulpis. The facts there dealt with an attempted recovery by a supplier, not by a consumer, and the rationale of the dismissal rested upon the distributor’s not having manufactured the article, advertised it or even marked it with its name or trade-mark. Here it is unquestioned that Wilmod initiated the manufacture of the nails and supplied the specifications for their manufacture. Here Wilmod supplied the box which contained the nails and had it marked with its trade name. To free Wilmod, which originated the manufacture of these nails, and then set them afloat on the stream of commerce, because of the absence of the traditional requirement of privity of contract, would turn back the clock and blunt the successful attacks which have been made on the outmoded citadel of privity of contract in recent years.
A monumental trilogy of cases has revolutionized this area of the law. (Greenberg v. Lorenz, 9 N Y 2d 195; Randy Knitwear v. American Cyanamid Co., 11 N Y 2d 5; Goldberg v. Kollsman Instrument Co., 12 N Y 2d 432.) The Kollsman case is particularly pertinent. There the Court of Appeals held that a suit in implied warranty by an airline passenger was main *555 tainable against the assembler and manufacturer of an allegedly defective altimeter. At pages 434 to 435 of its opinion the court said that: ‘ ‘ The question now to be answered is: does a manufacturer’s implied warranty of fitness of his product for its contemplated use run in favor of all its intended users, despite lack of privity of contract? ” It answered its own query when it said (pp. 436-437): “ that, at least where an article is of such a character that when used for the purpose for which it is made it is likely to be a source of danger to several or many people if not properly designed and fashioned, the manufacturer as well as the vendor is liable, for breach of law-implied warranties, to the persons whose use is contemplated.”
The principle thus enunciated should be applicable not only to the liability of a manufacturer, but also to the liability of a middleman. As is stated in section 20.04 in Frumer and Friedman on Products Liability: ‘ Although the courts are in disagreement, there is just as much reason to impose strict liability upon the middleman without requiring privity, as there is to impose strict liability without privity upon the retailer. Under today’s merchandising practices, the middleman is apt to know as much if not more than the retailer about the product and its manufacturer. The same policy arguments as to elimination of circuity of action and making accessible a solvent defendant obviously apply.”
I, therefore, hold that where a supplier, such as Wilmod here, has taken an active role in the manufacture of a product which, when manufactured defectively, is inherently dangerous, even though properly used, the doctrine of privity of contract may not be used by it as a screen to shield itself from liability. (See Willson v. Faxon, Williams & Faxon, 208 N. Y. 108.)
THE CLAIM OF MACROSE V. WILMOD
Even though Macrose and Wilmod are not in privity of contract, Wilmod, by detailing the specification for the nails and by then boxing them under its trade name, took such an active part in their manufacture that it must be held liable to the retailer, who has become liable to the purchaser, the plaintiff here, on the theory of breach of implied warranty.
RIGHTS IN WARRANTY BY WILMOD V. NISSHO AMERICAN
There was direct privity of contract between Wilmod and Nissho American. An implied warranty of merchantability of the nails, running from Nissho American to Wilmod, therefore, *556 came into being by reason of their relationship to each other. Realizing this, Nissho American argues that the warranty is negated by Wilmod’s alleged inspection of the nails. However, since there was no systematic inspection of the nails by Wilmod after their manufacture, this contention is without merit and Wilmod is entitled to a judgment over against Nissho American.
EIGHTS IN NEGLIGENCE OE SCHWARTZ V. MACEOSE
Having heretofore determined that the nail in question was not of “merchantable quality” because it did not attain a standard of “ at least a medium quality of goodness ” (Empire Cream Separator Co. v. Quinn, 124 App. Div. 302, supra), I also find, as a fact, that it was negligently manufactured.
Macrose* as a retail distributor, cannot be held liable for the negligent manufacture of the nail. The question is whether it can be held liable for its failure to inspect the nail where it had no direct dealings with the manufacturer and where, in fact, the Japanese manufacturer was unknown to it.
The traditional rule is that a retailer is liable in negligence for failure to discover defects which may be found by inspection alone as opposed to “ dangers so concealed that mechanical tests are needed to disclose them.” (Santise v. Martins, Inc., 258 App. Div. 663.) Such a result was also reached in Bruckel v. Milhau’s Son (116 App. Div. 832) and in Garvey v. Namm (136 App. Div. 315). In the latter case, the court held that a dry goods merchant who sold a garment with a basting needle in the hem which could have been discovered by inspection was liable for injuries sustained by the purchaser who was wounded by that needle because of the seller’s failure to inspect the garment.
Similarly, in Alfieri v. Cabot Corp. (17 A D 2d 455) the court held that a retailer who sold charcoal briquets which it had purchased from a reputable manufacturer had no duty to inspect the sealed bags of briquets where there was no proof that the retailer had actual knowledge of the dangerous qualities of the briquets. The court stated (pp. 458-459): “Considering first the question of liability as to A & P. Nothing appears in the record to indicate that Cabot is other than a reputable manufacturing concern. Testimony at the trial was to the effect charcoal is generally used for cooking, because its cost would be prohibitive if used by the casual customer for heating. There was testimony also that what might be termed the dangerous potential of charcoal or charcoal briquets, or its probable lethal quality from combustion under certain conditions, it is not gen *557 erally known to the public. This was a packaged product when purchased and when resold in the same container by A & P, and there was nothing to indicate that its use by the ultimate purchaser might be harmful. Nor was there any proof that A & P had actual knowledge of the dangerous qualities of the briquets. At most A & P was a conduit between the manufacturer and the members of the purchasing public, and it gave no guarantees or warranties in connection with the sale of the briquets. Nothing appears in the record to warrant an inference that Carlie and Alfieri relied upon the special competence of A & P as the vendor, or that A & P by mere inspection could have discovered the danger. Under all of these circumstances A & P should not be held liable even though it might have discovered the dangerous character of the briquets by a test under controlled conditions. There was no obligation upon it to make such test.”
The Appellate Division of this Department, however, in the case of Outwater v. Miller (3 A D 2d 670) has refined this rule. In that action an importer purchased from the manufacturer in England a partly assembled bicycle in a sealed carton and sold that carton containing a bicycle to a wholesaler, which in turn sold it to the retailer, who opened the carton and assembled the bicycle and sold it to the infant plaintiff who was injured when the front wheel came off. The court, in reversing the decision of Special Term which had granted summary judgment dismissing the negligence causes of action, stated: “ A bicycle is a dangerous article when defectively constructed or assembled. (MacPherson v. Buick Motor Co., 217 N. Y. 382, 387, 389.) A vendor who buys such goods from an unknown manufacturer or from one of dubious reputation knows that he does not know the condition of the chattel and has no reasonable ground for believing the chattel to be free from dangerous defects. (Restatement, Torts, § 401.) On the other hand, if the vendor buys from a reputable source of supply, he does have reasonable grounds for believing the chattel to be free from defects. (Restatement, Torts, § 402.) In the former case, the vendor does have the duty of inspection; in the latter, he does not. ’ ’
While the Outwater case did not specifically hold the retailer liable, the language of the opinion would apply to it, as does the rule laid down in section 401 of the Restatement of the Law of Torts. Though the obligation thus imposed upon a retailer seems to be quite onerous, I hold, under the authority of the Outwater case, by which I am bound, that Maerose, to whom the maufacturer was unknown, was under a duty to inspect the nail and its failure to do so constituted negligence.
*558 BIGHTS.EST NEGLIGENCE OF SCHWARTZ V. WILMOD
Plaintiff contends that defendant Wilmod should be held liable under the rule that “ One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer.” (Restatement, Torts, § 400.) The rule thus stated is now New York law. In Willson v. Faxon (208 N. Y. 108) the court held that a druggist, representing himself as a manufacturer of a product which he sold, became liable to the purchaser to the same extent as the actual manufacturers would have been if the purchase had been made from them. The court stated (pp. 113-114): “I think that when the defendant represented to the plaintiff by means of the statement contained in the label on the box that Faxon, Williams & Faxon were the manufacturers of the preparation it rendered itself just as liable to the purchaser as the actual manufacturers would have been if the purchase had been made from them. In other words, the defendant, by reason of this representation, became responsible to the plaintiff for the strength and quality of the preparation notwithstanding its patented or proprietary character; and, if the compound contained an injurious substance instead of being purely vegetable as the label declared, the defendant became liable in law for the injury suffered by the purchaser in consequence of ignorantly taking the concealed poison. * * * The defendant although representing itself to be the manufacturer, and, therefore, presumably acquainted with all the ingredients going to make up the medicinal preparation which it sold to the plaintiff, really knew nothing about the nature of the compound save what one of its agents had learned from Billings, Clapp & Co., to the effect that Kascara Kathartics were similar to Cascareis, and this witness admitted that he did not know what Cascareis contained. I think negligence could be predicated of [sic] the action of the agent of the defendant corporation in selling this medicine upon the representation that it was the manufacturer, without having taken any other or further means to ascertain the true character of the compound.”
In the case at bar Wilmod caused each individual box of nails to be labeled: “Mfrd in Japan for Wilmod Co. NYC”. It thereby placed itself in the same position as to legal liability that the actual manufacturer would have been in if it were sued by the purchaser. “ The mere fact that the goods are marked with such additional words as made for ’ the seller, or describe him as a distributor, particularly in the absence of a clear and distinctive designation of the real manufacturer or packer, is *559 not sufficient to make inapplicable the rule stated in this Section. The casual reader of a label is likely to rely upon the featured name, trade name or trademark, and overlook the qualification of the description of sources.” (Restatement, Torts 2d, § 400, comment d.)
Accordingly, I hold that where a seller labels g’oods as made for him without disclosing the name of the manufacturer of those goods, he has the duty to inspect those goods to ascertain whether they meet the specifications which he has himself imposed or, if he has imposed none, that they were not negligently manufactured. Its failure to so inspect the goods in this case constituted negligence and, accordingly, Wilmod is liable to the plaintiff for this failure and for the negligent manufacture of the nail as well.
BIGHTS IN NEGLIGENCE OE MACEOSE V. WILMOD
Macrose argues that it is entitled to recover over against Wilmod for any judgment which may be rendered against it on the theory of negligence because its negligence in failing to inspect the nails was “ passive ” while the negligence of Wilmod, which stands in the shoes of the manufacturer, is ‘ active ’ ’ negligence. I agree.
Generally, a joint tort-feasor is entitled to indemnification from another joint tort-feasor only where its negligence can be denominated to be “ passive ’ ’ in nature and the other tortfeasor’s negligence is of the “active” variety. The terms ‘ ‘ passive ’ ’ and ‘ active ’ ’ negligence represent characterizations of conduct based upon a court’s finding of varying and relative degrees of culpability where more than one negligent party is involved.
Here, since Wilmod’s negligence is, as a matter of law, that of a manufacturer, it is guilty of “ active ” negligence. However, the conduct of Macrose, as the retailer, in failing to inspect the nails, under the circumstances of this case, was that of a “passive” wrongdoer. In their treatise on “ Products Liability ”, Frumer & Friedman, (vol. 2, § 44.02 subd. [3], par. [b]) state that: “We have previously pointed out that generally a retailer is under no duty to inspect. Under some cases, however, or under certain circumstances, such a duty may be owed by a retailer. It would seem that where there is such a duty on the part of a retailer and he is held liable to an injured person solely because he neglected to inspect, the retailer would be entitled to indemnity from the manufacturer of the product whose negligence created the defect or danger.”
*560 The court so held in Ruping v. Great Atlantic & Pacific Tea Co. (283 App. Div. 204). That case involved an appeal of the defendant retailer from an order dismissing its cross claim against the defendant manufacturer. The complaint stated two grounds of negligence on the part of the retailer: (1) the manner in which the defective article was stored and handled by the retailer and (2) negligence in failing to detect defects in the article which in the exercise of reasonable care the retailer allegedly could have discovered.
In reversing Special Term, the court said (p. 206): “ Under the complaint, the A. & P. might be held liable to the plaintiff either for its own affirmative negligence in the way in which it handled and exposed the bottle, in which case there could be no recovery over, or it might be held liable on the ground of secondary or passive negligence for failing to discover a defect in the bottle which had been caused by the Eeed Class Company’s primary negligence in the process of manufacture. In the latter event, the A. & P. would be entitled to recover over against the Eeed Glass Company (Restatement, Restitution, § 93, ‘ Indemnity from Negligent Seller or Supplier’).” The court also noted: “ This case would seem to present a classic instance of a right of recovery over, against a primary wrongdoer whose misconduct had created a dangerous condition, by one who was held liable for failure to discover and remedy the danger. (Leflar, ‘ Contribution and Indemnity Between Tort Feasors ’, 81 U. of Pa. L. Rev. 130, 156; McFall v. Compagnie Maritime Belge, 304 N. Y. 314, 329-331.) ” (See, also, Amantia v. General Motors Corp., 155 N. Y. S. 2d 294.)
Macrose is, therefore, entitled to recover over against Wilmod on the negligence cause of action.
RIGHTS IN NEGLIGENCE OF WILMOD V. NISSHO AMERICAN
Since Wilmod has been held to be guilty of “ active ” negligence, it is not entitled to indemnity from Nissho American on the negligence cause of action which was, if at all negligent, only “ passively ” so.
It is unnecessary to discuss the nature of the injury to plaintiff’s eye since the proof in that regard is undisputed. Judgment is awarded the plaintiff in the sum of $95,000 and judgments in like amounts are awarded on the cross claims as specified in the determination here made.