Bertram Harnett, J.
Neighbor Finks’ garage was constructed by builder 666 Realty Corp. (666) so close to neighbor Flood-Kolmel’s angular property line that driveway entry to the garage in. its present state requires passage over Flood-Kolmel land. In a local donnybrook, unfortunately common to neighborhood boundary disputation, the Finks seek here a declaration of easement (either express or implied) over their neighbor’s property, or in the alternative, rescission against the builder.
A. FACTS OF THE DRIVEWAY CONTROVERSY
First, a rough drawing of the physical scene in Baldwin, New York, will be helpful.

*430

As can be seen, the total area forms what is generally known as a panhandle parcel; three homes are in the pan, and access to the street (here Thomas Avenue) is largely in the handle.
The Fink, Flood-Kolmel, and Connor parcels were previously part of this larger single panhandled parcel, which was owned and developed in 1968-1971 with three one-family houses by 666. A common driveway was formed out of three lots (126, 127, and 128) comprising the handle of the pan. Three offshoot subdriveways, from each plot, formed in the pan, then emptied by way of the handle into the adjoining public street.
The double lines in the sketch drawn above mark the Fink property boundaries. The cross-hatched area is all blacktopped, either as roadway or driveway. The dotted lines separate Lots 126,127, and 128, from a much larger lot (formerly denominated, but not inscribed above, as 444) to the south,' from which the three residential plots were carved by builder 666, oach then connected to and being conveyed with one of the smaller lots in the handle.
The easterly parcel, purchased by Gordon Connor, is not involved in this proceeding. <
*431 By contract dated October 22, 1968 the westerly parcel was purchased by Isabelle Flood and title was conveyed by 666 on February 11, 1970. On December 23, 1971 Mrs. Flood conveyed her parcel to her daughter and son-in-law, Dolores and Ronald J. Kolmel. In addition to Mrs. Flood, Ronald J. Kolmel only is named as a defendant concerning the westerly parcel, and represents both his own and his wife’s interests.
On July 10, 1969 Dr. Ira and Mrs. Theresa Fink contracted to buy the middle parcel, conditioned upon 666 erecting a proposed one-family dwelling. After the construction was completed, the Finks took title on May 14,1970.
Appropriate variances had been obtained for this project by 666 from the Town of Hempstead Board of Zoning Appeals. None of the proceedings, contracts of sale, or deeds, mentioned any easements reserved in, or granted by the seller or any of the purchasers, except for the common use of Lots 126, 127, and 128 in the ‘ ‘ handle ’ ’ driveway to the street.
All went well in the pan until March, 1971 when Dr. Fink got a survey for some proposed landscaping. He claims he then learned for the first time that much of the driveway to his attached two-car garage was on the Flood-Kolmel property. He recalled that 666 had initially proposed to locate the garage on the east side of his house squarely in the center of the access area. Later, however, 666 modified the plan to position the garage on the west side, right up against Flood-Kolmel. The garage was then so close to the Flood-Kolmel land, and the angle of the property line was such, that a car entering or leaving the garage had to traverse Flood-Kolmel land. The Kolmels, upon learning of the landscaping survey results and the encroachment upon their land, objected. Amicable attempts by the parties to resolve the matter failed. Fences were built, harsh words exchanged, and this litigation flowered.
B. EXPRESS EASEMENT
There is plainly rio express easement covering the area of current dispute. A recorded easement agreement entitled “ Declaration of Restrictions ”, dated June 24,1968 and received in evidence, in effect, joins Lots 126, 127, and 128, in a common roadway “ for purposes of ingress and egress to [the] respective dwellings ”. However, by its explicit terms, the easement agreement applies only to those three lots. The trouble here takes place south of that, in the old Lot 444, which is nowherq mentioned in the declaration. The parties have all agreed to this *432 on the record, and, therefore, have conceded that there is no express easement which governs the disputed driveway area.
-Moreover, the easement agreement, affecting only Lots 126, 127, and 128, is complete and unambiguous in its terms. It offers no basis for implication of any further easements not on record, particularly one such as is sought here, which is narrowly related to garage access in part of Lot 444, not to usage of the common area in the handle for simple access to the ‘ ‘ dwell-, ing ”. (Cf. Joss v. Niagara Mohawk Power Corp., 41 A D 2d 596.)
C. IMPLIED EASEMENT?
Accordingly, the Finks’ easement contention must rest on implication.
1. ELEMENTS OF EASEMENT IMPLICATION
An easement may be implied from a pre-existing use on two kinds of situations.
First, there is a doctrine that a right of way may be formed ■ if the use is strictly necessary, and without any alternative, for the proper enjoyment of the burdening parcel. The Finks do not pass this severe test, since, theoretically, their house could be moved a few feet south' or east to provide garage access. (Heyman v. Biggs, 223 N. Y. 118, 125-126; Matter of City of New York, 250 App. Div. 137, affd. 274 N. Y. 503.) More practically, reasonable garage use could be established with some property renovation. 1
Secondly, and comprising the Finks’ main claim here, an easement may be implied on more fluid principles by establishing four elements (McQuinn v. Tantalo, 41 A D 2d 575, 576): (a) original unitary ownership of the two estates; (b) while unitary ownership existed, the then owner must create the use subordinating one estate to the other; (c) the adverse use must be plainly and physically apparent on reasonable inspection; and (d) the use must affect the value of the estate benefited and must be necessary to the reasonable enjoyment of that estate.
Each of these four factors must be present at the time the unitary parcel, or part of it, is sold. (Amalgamated Props. v. Oakwood Gardens, 148 Misc. 426, affd. 238 App. Div. 867; see Cassano v. Merriewold Club, 24 A D 2d 819, affd. 19 N Y 2d 640; 2 Warren’s Weed New York Real Property [4th ed.], § 6.01.)
2. MEASURING THE FACTS AGAINST THE LEGAL ELEMENTS
There is no dispute that 666 was legal owner of the Fink and Flood-Kolmel properties in February, 1970 when the first *433 to be conveyed parcel was conveyed to Mr. Kolmel’s mother-in-law. Moreover, access to the garage seems to affect the property value if an easement is not found. But, the path to conclusive easement implication ends there.
The court finds that the Finks have not sufficiently shown the presence of other required elements of easement implication.
First, the claimed impingement of the driveway was not apparent to all. The original proposed house had no driveway limitations whatever. Here, the 666-Fink community simply and voluntarily repositioned the garage to make it too close to the neighboring parcel. No one apparently knew it until the Fink landscape survey discovery. The Fink/Flood-Kolmel property line was misperceived by both neighbors. There was no evidence that 666 was aware of the driveway encroachment when it sold either parcel. While the Fink building was constructed and the pavement in front laid by 666, and the driveway was used for a short period by the Finks without neighborly objection, these events did not “ create ” a subordinating use that was “ plainly and physically apparent upon reasonable inspection ”. (McQuinn v. Tantalo, supra, p. 576; see Alleva v. Tornatore, 254 App. Div. 525, 527, affd. 279 N. Y. 770.) The obviousness of an encroachment depends on the awareness of the burdened and burdening landowners as to ownership of the disputed parcel. (Tubb v. Rolling Ridge, 28 Misc 2d 532.) Acquiescence borne out of mutual mistake does not create an easement. There is no showing that 666, the Finks, Mrs. Flood, or the Kolmels intended, or even knowingly permitted, an easement to exist. No easement markings or shadings were indicated on any of the maps or drawings made. (Cf. Buffalo Lockport & Rochester Ry. Co. v. Hoyer, 214 N. Y. 236, 244.) Indeed, the evidence shows that both present neighbors, upon discovery of the actual property line, not previously apparent, hotly disagreed about the resulting implication: subordination, vel non.
Second, the, ingredient of builder subdivision bears generally upon, and here against, the element of initial subordination. 666 was not the sole unitary owner of the parcels at the time of legal conveyance of the subdivisions. By virtue of their contracts, both Flood and the Finks were equitable owners of their portions of the land before the driveway was completed. And, as a practical matter, since the contracts of sale were made contingent upon proper construction (and placement) of the homes according to the specifications jointly agreed upon, the involvement of the fractional taker of a portion of the unitary parcel in the land usage plan was substantial. Certainly, it cannot be *434 said that the claimed easement was established exclusively by the prior unitary owner. And, strictly speaking, 666, as prior owner of both subdivided parcels, built the Fink driveway, but did not “use” it. The requirement of' an overriding usage imposed by the prior unitary owner is therefore not met.
Third, the factor of time weighs against the Finks. Continuous overlapping use over a substantial period of time is usually present in easement implication. (See Ochs v. Cladot Prods., 37 Misc 2d 450, 452.) Here, the encroaching use had, in fact, no real longevity, commencing as it did with the breakup of the unitary parcel. The Finks had used the garage barely 10 months before the dispute arose. (Cf. Haase v. Zobkiw, 36 A D 2d 821.)
3. CONCLUSION
In sum, the plaintiffs have failed to demonstrate that an easement by implication exists in their favor across any part of the Flood-Kolmel property.
D. RESCISSION AND DAMAGES
The Finks seek, alternatively, contract rescission and incidental damages based upon the builder’s failure to comply with the contract of sale.
1. THE BREACH OE CONTRACT
We find that the builder, 666, did breach the contract of sale in constructing the home so that the two-ear garage significantly lacked automobile access. As built, the garage could only be lawfully approached on foot. 666, in the contract signed by its principal, Paul M. Friedman, agreed to construct the dwelling “ as per plans and specifications of seller,” including a “ Driveway 17' wide from garage doors to angular property line”.
While strictly the driveway was 17 feet wide for a tiny length, a reasonable and adequate driveway into the garage is clearly implied. Indeed, 666 conceded on trial that both it and the Finks held an intent to permit reasonable garage access. The change of garage location created the defect whereby vehicular use of the garage was nullified, a point apparently missed by both parties. Manifestly, there is no sense in selling someone a garage, half of which cannot be entered by a car.
2. RESCISSION NOT AVAILABLE HERE
Rescission of a contract is permitted where a breach is so substantial as to defeat the purpose of an entire transaction. (Callanan v. Keeseville, Ausable Chasm and Lake Champlain *435 R. R. Co., 199 N. Y. 268; O’Herron v. Southern Tier Stores, 9 A D 2d 568.) The breach must go to the very root of the contract, rendering performance different in substance than that agreed upon and depriving one party of the fruits of the agreement. (Dermer v. Barrett, 202 App. Div. 828, affd. 235 N. Y. 588; Smith v. Johannsen, 199 App. Div. 823.) A lesser breach will not warrant rescission. (Trainor Co. v. Amsinck & Co., 236 N. Y. 392.) These general rides apply in the particular instance of an owner seeking rescission of a building contract. (Callanan v. Keeseville, Ausable Chasm and Lake Champlain R. R. Co., supra; Kempa v. Moell, 283 App. Div. 681.)
Rescission, then, is a drastic remedy available only when certain conditions are met. The party seeking rescission must act reasonably promptly to cancel the agreement after discovery of the defect, it must be reasonably feasible to place both parties back in the positions they occupied before the transaction took place, and the injury resulting from the deficiency must not be practically compensable by money damage award (Rudman v. Cowles Communications, 30 N Y 2d 1.)
The failure here did not go to the essence of the contract. While material in its aspect, the garage access deficiency could be simply remedied at least as to one-car use. In any event, by the Finks’ own testimony, the total dimunition in property value here is only about 10% of the entire property worth. Although the circumstances are plainly aggravating to the Finks, they do have access to money damages. And, the changes in the property made by the Finks during their three years of occupancy make it particularly difficult for the parties to be put back in their preconveyance positions. (Rudman v. Cowles Communications, supra, pp. 13-14; Tarleton Bldg. Corp. v. Spider Staging Sales Co., 26 A D 2d 809.)
Finally, the court must note in this equitable quest, the Finks are somewhat impeded by their own participation in moving the garage and car concentration from a clearly good location in the center of their own property to a manifestly tight fit on their neighbor’s doorstep. The inopportune location of the building and garage, with offsetting advantages of diverting vehicles to the side away from the front door, and allowing a larger backyard, does not carry with it an automatic “ out ” of the transaction to those who participated all along and stand to recoup the offsetting gain.
The court holds therefore that the Finks are not entitled to rescind their contract with 666 and receive back their purchase price.
*436 3. DAMAGES FOB BREACH OF CONTRACT
There was, as found above, a breach of contract in the failure by 666 to deliver the house with the garage use contracted, and for that it must respond in damages. Although the Finks do not specifically request monetary damages apart from their two claims for easement implication and contract rescission, they do request damages incidental to these equitable thrusts. Even in the absence of favorable findings upon those primary equitable assertions, the court can grant some monetary recompense as “ such other and further relief as to [it] may seem just and proper ”, as requested in plaintiffs’ complaint. (See 5A Corbin, Contracts, § 1223; Honaker v. Ralph Pool’s Albuquerque Auto Sales, 74 N. M. 458.) Since the question of breach was ever apparent throughout the litigation, along with the resulting harm, there is no prejudice in now ruling upon it.
The court finds from the testimony that the dimunition of market value caused the Finks by the breach is $5,000. In addition, it finds that $1,450 would be required to create an acceptable one-car garage premise. It also awards $650 for appraisal and consulting services. The total award, therefore, will be $7,100, with interest from July 10, 1969.
The Finks’ request for an award of counsel fees cannot be honored. Under our legal system, counsel fees are awarded a winning party from the party he defeats only where expressly provided by statute or instrument, or where there are fraudulent circumstances dictating unusual legal expenditure. (City of Buffalo v. Clement Co., 28 N Y 2d 241, 262-263; Klein v. Sharp, 41 A D 2d 926.)
E. OTHER PARTIES
As indicated orally, on the record in the course of trial, relief against other named defendants is not available. Although Mr. Friedman participated in the contract signing, the garage modification, and ultimate construction, he did so only in his capacity as a corporate officer. Plaintiffs have not shown any evidence of his acting as an individual or acting outside of the scope of his authority so as to be exposed to personal liability. (Salzman Sign Co. v. Beck, 10 N Y 2d 63; Liebermann v. Princeway Realty Corp., 17 A D 2d 258; see Turntables v. M. B. Plastics Corp., 31 A D 2d 792.) The court’s only direction as to Mr. Friedman will be in his official corporate capacity.
The title company acted within the state of the record. Patently, there was no valid claim proven against it. In the Finks ’ brief, this is admitted.
*437 Finally, there was no improper action shown on the part of the Board of Zoning Appeals of the Town of Hempstead.
F. JUDGMENT
Accordingly, judgment is granted, Lanza v. Wagner (11 N Y 2d 317); Baker v. Cole-Layer-Trumble Co. (42 A D 2d 581), declaring: (1) There is no easement running in favor of the property owned by the Finks in favor of the adjoining property now owned by defendant Kolmel; (2) The contract of sale executed on July 10, 1969 by defendant 666 and plaintiffs is not to be rescinded; (3) 666 shall pay to the Finks $7,100, plus interest from July 10, 1969 for money damages, in breach of contract, within 30 days of being served with a copy of the judgment to be entered herein; (4) In all other respects, including the third and fifth oauses of action, the action is dismissed.