**STAHL MANAGEMENT CORPORATION,
Plaintiff,**

v.

**CONCEPTIONS UNLIMITED and Joel Spiro, Defendants.**

No. 81 Civ. 1707 (KTD).

United States District Court,
S.D. New York.

Jan. 4, 1983.

Brown & Raysman, New York City, for plaintiff; ·Richard Raysman, New York City, of counsel.

Frank & Ross, New York City, for defendants; N. Barry Ross, New York City, of counsel.

1. Spiro had begun CU by himself in 1978 and by the spring of 1979, CU included two other

MEMORANDUM

KEVIN THOMAS DUFFY, District Judge:

Stanley Stahl decided in the Spring of 1979 to spend his vacation in his old home state of Vermont. While there he stopped in to see a neighbor he had known since 1969, Joel Spiro. The conversation between the two men quickly turned to business, and a subject of mutual interest: computers. Stanley Stahl was vice-president of Stahl Management Corporation ("Stahl Management"), a company engaged in managing residential and commercial real estate. Spiro, a defendant herein, operated Conceptions Unlimited ("CU"), another defendant, which was in the business of selling computer hardware, and developing and selling application computer software.[1]

Stahl's interest in computers dated back to early 1978 when he and his brother Michael Stahl, the president of Stahl Management, decided that their company could conduct business more efficiently and profitably if certain information were computerized. In particular, Stahl was interested in computerizing information relating to fuel oil management, building maintenance, service orders, and monthly rent bill mailings. By the time Stahl and Spiro met in 1979, Stahl Management had reviewed several hardware/software packages on the market, and had determined that its requirements could best be met through use of a business application minicomputer system.

The initial conversation between Stahl and Spiro soon led to discussions in greater depth concerning CU's capability to develop the necessary software for Stahl Management. As the Summer of 1979 progressed, Michael Stahl entered the negotiations with Spiro and CU. Finally, in July of 1979, CU provided Stahl Management with a proposal entitled the "Charter." Plaintiff's Exhibit 1. A contract was executed by Michael Stahl and Joel Spiro soon thereafter on September 26, 1979. Plaintiff's Exhibit 2. Under the contract plaintiff was to pay

employees.

$30,000 for the computer software developed by Spiro and CU. Simultaneously with the contract signing, Spiro signed a letter provided by Stahl stating that all contractual work had to be supervised by Spiro, and that in the event of CU's breach of the contract, Spiro was personally liable for up to $30,000 in damages. Plaintiff's Exhibit 4. Spiro signed the guarantee letter.

The contract provided, *inter alia,* that CU would provide Stahl Management with a two-phase system. Phase I included several functions: a method of recording repair complaints from tenants, an update repair file, a request information function to print various reports on repairs, a purge completed repairs function, a file management function, fuel transactions' programs, and a system for printing rent bills. Phase II, which was only outlined in the contract, required programs concerning accounts receivable, tenants status inquiry and reporting, arrears inquiry and reporting, dispossession list, vacancy list, and tenant history. The specifics of the Phase II programs were to be worked out after the completion of the Phase I functions. CU also supplied Wang computer equipment to Stahl Management as part of the agreement for an additional cost of $45,500.

The contract stated that the fuel consumption programs of Phase I were due by November 1, 1979. The balance of the Phase I functions were to be provided by March 1, 1980. Phase II functions were to be operational by January 1, 1981. By November 1, 1980, however, Spiro had encountered unforeseen obstacles in attempting to create the fuel consumption program. The programming was proving to be more difficult than he had originally envisioned. Spiro, therefore, notified Stahl Management of his difficulties, and subsequently delivered a revised program in late November. According to plaintiff, this new program did not meet contract specifications; according to defendants, plaintiff requested functions in the program not previously required by the contract. In the ensuing months, Spiro delivered several revamped fuel consumption programs, the last one in March or April of 1980. After this last fuel consumption program delivery, Spiro and CU did nothing further under the contract. Stahl Management brought this suit on March 23, 1981, against the defendants alleging breach of contract, breach of warranty, fraud, and misrepresentation. It is undisputed that Spiro and CU did not deliver the rest of the Phase I programs, nor any of the Phase II programs as required by contract. Thus, because CU failed to complete the contract, the crucial inquiry at a two and a half day bench trial before me was whether CU has a valid defense to its apparent contract breach.

I

## CU's DEFENSES

Defendant's two principal defenses at trial were accord and satisfaction[2] and rescission.[3] I find that defendants have failed to prove either defense.

### A. Accord and Satisfaction

■ An accord and satisfaction is an agreement between two parties under which one party accepts a stipulated performance by the other party in discharge of an unresolved obligation by the latter party. *Rein v. Wagner,* 268 N.Y.S.2d 659, 662,

**2.** Defendants label one defense novation. Defendants' Post-Trial Brief at 4. Novation, however, involves the substitution of a third-party for one of the original parties to the contract, and an extinguishing of the original duty. *S & L Paving Corp. v. MacMurray Tractor Corp.,* 304 N.Y.S.2d 652, 61 Misc.2d 90 (1969). Accord and satisfaction, on the other hand, is a new obligation intended to replace the existing one, along with the satisfaction of the substituted obligation. *Rein v. Wagner, supra.*

Therefore, I will treat defendants' alleged defense as accord and satisfaction, because the absence of a new party precludes the defendants from asserting the defense of novation.

**3.** Defendants assert two other affirmative defenses only in connection with the plaintiff's fourth cause of action. Because I find for defendants on this fourth cause of action, *see infra* Section II, it is unnecessary to discuss either defense.

49 Misc.2d 683, *modified on other grounds,* 269 N.Y.S.2d 578, 25 A.D.2d 356 (1965), *aff'd,* 18 N.Y.2d 989, 224 N.E.2d 728, 278 N.Y.S.2d 223 (1966). "To establish an accord and satisfaction, [there] must [be] an intention to discharge the old obligation when the new one has been performed." *Id.* (citation omitted). In the instant case, defendants argue that the plaintiff agreed to discharge defendants of their contractual duty to deliver the balance of the Phase I and Phase II programs in return for defendants' supplying all of the "additional" requested functions in the fuel consumption program without any additional compensation. The defendants, however, have the burden of proving their affirmative defense of accord and satisfaction, *Reilly v. Barrett,* 220 N.Y. 170, 173, 115 N.E. 453, 454 (1917), a burden they have not met.

Defendants do not have any written documents to support their defense.[4] Instead, they rely principally on defendant Spiro's testimony at trial. I found this testimony neither persuasive nor credible. For example, at trial Spiro claimed that this putative agreement was reached at some uncertain date in February. In their post-trial brief, however, the defendants inconsistently now allege that the accord and satisfaction occurred "about December." Defendants' Post-Trial Memorandum at 2.

Defendants also presented a witness, Lawrence Johnson, a CU employee, in support of their claim that plaintiff agreed to terminate the contract at a meeting in April, 1980. Johnson, however, admitted that termination of defendants' contractual duties was never explicitly or directly discussed during the meeting. He testified that Michael Stahl essentially stated that

"we hope it works the way you said it would"; and Spiro replied "you need any help, give me a call." The defendants' presentation of contradictory testimony thus places the entire viability of the defendants' defense in great doubt.

Moreover, common sense suggests that plaintiff would not have agreed to defendants' proposal, had it been made as defendants maintain. The fuel consumption program was apparently less than a quarter of the programming due under the contract, yet the alleged agreement did not provide for any rebate of the $30,000 paid by plaintiff.[5] Defendants claim that they provided several "extra" functions in payment for their contractual release. In reality, however, defendants admitted that this amounted to no more than the addition of one data field. Trial Testimony of Defendant Spiro. Spiro claimed at trial that he spent substantially more time programming the fuel consumption program than he had originally anticipated. This does not excuse his attempt to evade his contractual obligations, though it may explain his attempt to avoid them. *See 407 E. 61 St. Garage v. Savoy Fifth Ave. Corp.,* 23 N.Y.2d 275, 244 N.E.2d 37, 296 N.Y.S.2d 338 (1968) (a bad or financially unprofitable bargain does not permit defendant to abrogate his contractual obligations).[6]

In sum, defendants failed to prove accord and satisfaction by a preponderance of the credible evidence at trial. Therefore, I turn to defendants' second asserted defense: rescission.

## B. *Rescission*

Defendants have claimed, in the alternative, that plaintiff agreed to rescind the

4. Plaintiff argues that defendants' accord and satisfaction defense actually is an executory accord which requires written documentation. N.Y. General Obligations Law § 15–501 (McKinney 1978). Defendants have no such written documentation. Defendants' failure to sustain their burden of proof, however, renders it unnecessary to evaluate plaintiff's argument.

5. The fuel consumption program was in use for seventy-seven weeks before Stahl Management discarded it as unusable. It was unable to

salvage anything from its nearly $30,000 investment.

6. Defendants' difficulty in profitably supplying the programs required by the contract probably stem from Spiro's substandard pre-programming preparation. As described by Alan Hoffberg, plaintiff's expert, the usual industry practice is to prepare detailed specifications in conjunction with in depth discussions with the client *before* any programming takes place. Defendants failed to do this.

original September 26, 1979 contract, and to substitute in its stead the promise to further develop the fuel consumption program. I find that defendants again failed to sustain their burden of proving their asserted affirmative defense.

In the case of both accord and satisfaction and rescission, "[i]t is frequently difficult to determine whether a new agreement is a substituted contract.... It is wholly a question of intention, to be determined by the usual process of interpretation, implication, and construction." *S & L Paving Corp. v. MacMurray Tractor, Inc.,* 61 Misc.2d 90, 304 N.Y.S.2d 652, 658 (1969), *quoting* 6 Corbin on Contracts § 1293 at 190. Defendants have not shown that the parties intended to rescind their original contract. This insufficiency of proof, charted above in discussing defendants' failure to show plaintiff's intention to enter into an accord and satisfaction, is equally applicable here. Equitable considerations further militate against finding rescission. Usually, rescission may be obtained only when it is reasonably feasible to return the parties to their pre-contract status quo. *See, e.g., Fink v. Friedman,* 78 Misc.2d 429, 358 N.Y. S.2d 250 (1974); *Tarleton Bldg. Corp. v. Spider Staging Sales Co.,* 26 A.D.2d 809, 274 N.Y.S.2d 43 (1966). Defendants have made no attempt to return plaintiff to *status quo ante.*[7] In sum, defendants have failed to prove the affirmative defense of rescission.

## II

### BREACH OF WARRANTY, FRAUD, AND MISREPRESENTATION

Plaintiff also asserts causes of action for defendants' alleged fraud, misrepresen-

tation, and breach of express warranties. At trial, however, plaintiff did not provide sufficient evidence of defendants' intent to prove either fraud or misrepresentation. *See Ajax Hardware Mfg. v. Industrial Plants Corp.,* 569 F.2d 181, 186 (2d Cir.1977) (New York law requires more demanding "clear and convincing" evidence standard of proof to establish fraud). I have little doubt that initially Spiro did have a good faith belief that he could perform his obligations under the contract. Absent proof of the requisite intent, plaintiff's claims based on fraud and misrepresentation are dismissed. *Pittsburgh Coke & Chem. Co. v. Bollo,* 421 F.Supp. 908 (E.D.N.Y.1976), *aff'd,* 560 F.2d 1089 (2d Cir.1977).

Plaintiff also asserts a breach of warranty claim against the defendants. This claim relies on the same factual and legal foundation surrounding the plaintiff's claim for breach of contract. Analogously, the damages flowing from this alleged breach would duplicate the breach of contract damages.[8] Therefore, because no duplicative damage award will issue, the only remaining issue is the amount of damages sustained by plaintiff flowing from defendants' breach of contract.

## III

### DAMAGES

Plaintiff has claimed $250,000 for breach of contract and $30,000 for breach of warranty. Complaint ¶¶ 27 and 34. In its "Calculation of Damages", plaintiff's Exhibit 9, plaintiff enumerates $29,986.96 for

7. Arguably, plaintiff's receipt of the upgraded fuel consumption program without additional cost restored it to *status quo ante.* Plaintiff, however, paid the defendants $30,000 and only allegedly received $6,000 worth of extra work. The fuel consumption program—installed for $24,000 if this argument were followed—did little more than mimic plaintiff's manual fuel consumption program. *Compare,* computer print-out, Defendants' Exhibit B, *with* "Superintendent's Oil Consumption Chart," Plaintiff's Exhibit 8. Thus, the substantial financial loss plaintiff would have sustained had it been asked to rescind the contract makes it both

improbable that it would have agreed to such a proposed rescission, and inappropriate to grant rescission.

8. The only potentially different liability for damages surrounds the cost of the hardware purchased for plaintiff by CU. Plaintiff apparently dropped this claim for the cost of the hardware at trial. *See* Exhibit 9, "Calculation of Damages." Furthermore, the hardware malfunction more likely resulted from plaintiff's failure to purchase a service maintenance contract than from any equipment defect.

payments made to CU for the software program, and $48,511.96 for lost employee time in handling the substandard fuel consumption program.

 I find first that defendant is liable for the $29,986.96. Plaintiff paid for a package of computer software programs. In return it received one part of that package, and even this part (the fuel consumption program) eventually was discarded as unusable. Defendants failed to perform their contractual duties, and must return plaintiff's payment for the non-delivered goods. N.Y. Uniform Commercial Code §§ 2–713 & 714 (1964). Defendant, therefore, is liable for the $29,986.96 loss suffered by the plaintiff.

Defendant is also liable for plaintiff's lost employee time expended attempting to overcome the difficulties of the delayed and substandard fuel consumption program. *Id.* Michael Stahl testified that Stanley Stahl devoted five extra hours per week in lost time to this contract over a total of 77 weeks. At his $30 hourly rate, the lost employee time for Stanley Stahl was $11,-350.00. In addition, Ms. Carmen Fugazy, a temporary employee, spent four weeks inputting back data because of defendant's late delivery of the first fuel consumption program. At her weekly rate of $300, this amounts to $1,200. These amounts are recoverable. Plaintiff also asserts that Al Fugazy, Stahl Management's office general manager, spent an extra five hours per week due to defendants' breach of contract. Fugazy, however, testified at trial that he expended approximately two to three extra hours per week over the 77 week period. At his rate of $15 per hour, and at an average of two and one-half hours extra per week, plaintiff's loss for its employee Al Fugazy amounts to $2,887.50. Therefore, defendant is liable for $15,637.50 in lost employee time. Total damages assessed are $45,624.46.

Interest will run from the date when defendants' breach was clearly established. By April 1980, the defendants had decided not to deliver any further programs required by the contract, and had decided to do no more work on the substandard fuel consumption program. *See* Trial Testimony of Joel Spiro and Lawrence Johnson. It is reasonable, thus, to begin interest calculations from April 15, 1980.

The defendant CU is liable for the full damages of $45,624.46 plus interest. Defendant Spiro is personally liable for any of these monies CU is unable to pay, up to the maximum amount of $30,000 as set out in the signed personal guarantee. *See* Plaintiff's Exhibit 4.

Settle judgment on ten (10) days notice within ten (10) days from the date hereof.