COMPUTERIZED RADIOLOGICAL
SERVICES, INC., Plaintiff,

v.

SYNTEX CORPORATION and Syntex
Analytical Instruments, Inc.,
Defendants.

No. 78 CV 2831.

United States District Court,
E.D. New York.

Oct. 22, 1984.

Speno, Goldberg, Moore, Margules & Corcoran, P.C., Mineola, N.Y., for plaintiff; Paul F. Corcoran and Timothy R. Aland, Mineola, N.Y., of counsel.

Holtzmann, Wise & Shepard, New York City, for defendants; Norman Solovay and Kathy Dutton Helmer, New York City, of counsel.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

This civil action is among the oldest on the dockets of this court. It arose from the ashes of the "computerized tomographic scanning" industry, which was the darling of the medical profession during the last decade, but which, with the advent of nuclear magnetic resonance, will probably be relegated to the dustbin of fluoroscopes and head mirrors. The case was tried before me, without a jury, for a period extending over a year. Plaintiff is a group of Long Island radiologists. Defendants manufactured computerized tomographic scanning equipment. The following constitute the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52.

### Findings of Fact

Computerized Tomography ("CT") was introduced by EMI Ltd. of London in 1972 and was immediately hailed by doctors as the most revolutionary diagnostic tool since Roentgen discovered X-rays in 1895. The machine known as a CAT (Computerized Axial Tomography) Scanner takes thousands of individual X-rays that are unscrambled by computer into a single picture. Delicate differences in tissue density, which are the key to X-ray diagnosis, show up 100 times more clearly than on conventional X-ray film. The Scanner examines thin cross-sections of tissue at various depths within the body, enabling doctors for the first time to zero in on problem areas. Scanners not only help save lives, they also help physicians to monitor accurately the results of medication and surgery; they reduce patients' exposure to harmful radiation; and they curtail the need for the painful and hazardous diagnostic procedures used to make conventional X-rays more revealing.

The significance of CAT Scanners was not lost upon the business community. By July 1975, EMI had received 200 orders for its $450,000 head scanner. Technicare had also entered the market, and by November 1975 had booked 115 orders for its unit. From January to July 1975, EMI's stock more than doubled and Technicare's more than tripled. Other companies hurried to enter the market. Among them were the defendants, Syntex Corporation[1] and its subsidiary, Syntex Analytical Instruments, Inc. ("SAI"), a major worldwide corporation in the health care field.

Early in 1975, a group of radiologists on Long Island decided that computerized tomography would enhance their ability to offer diagnostic radiological services to attending physicians (e.g., neurologists) in Long Island. To this end they formed a corporation named Computerized Radiological Services, Inc. ("CRS"), the plaintiff in this action.

Syntex and the plaintiff, CRS, had their first dealings at the annual meeting of the Radiological Society of North America ("RSNA"), which took place between November 29 and December 5, 1975, in Chicago. (See Plaintiff's Exhibit ("PX") 36). The exhibits by CAT Scanner manufacturers were the focus of the meeting and eclipsed all others. (Transcript of Trial ("Tr.") 2697, 2699–2700, 3136). Interest in them was so extensive that observers referred to it as "CAT fever." (Tr. 837).

---

1. The second defendant, Syntex Analytical Instruments, Inc. (SAI), a wholly-owned subsidiary of Syntex Corporation, was the operating subdivision of Syntex Corporation that developed and marketed the Syntex computerized tomography equipment. SAI is no longer in business. Defendants have stipulated that Syntex Corporation was responsible for the CT effort and is liable for any damages resulting therefrom. Accordingly, Syntex Corporation and SAI are jointly referred to as "Syntex".

Three of the four CRS principals, Drs. Zwanger, Pesiri, and Kansler, attended the 1975 RSNA meeting. Kansler understood the electronics of X-ray equipment as well as its medical use. He had many contacts in the CT field to whom he spoke frequently and he read the CT literature thoroughly. (Tr. 1202, 1532; Kveton Deposition ("Dep.") 24–25). Kveton was the group's finance man. (Tr. 1308–09, 1481). Pesiri was its construction and architectural expert. (Tr. 1291–92, 1307, 1533). Zwanger, known by everyone as "Mr. Radiologist of Nassau County," (Tr. 1309), was apparently their public relations expert.

Kansler and Zwanger were the real "emissaries" of the group; and they attended the meeting specifically to determine which CAT scanner to buy for CRS. Kansler hoped to find an alternative to the EMI scanner, which would have been his first choice except that it required a large down payment and took a long time for delivery. The Syntex scanner appealed to CRS because of its earlier delivery schedule and its lower deposit requirement. (Tr. 840–43, 1048–50).

CRS was intent on owning the first private scanner in Nassau County, believing that its prestige and professional reputation would be enhanced by such a coup. (Tr. 769, 808, 1269, 1342, 1350; Zwanger Dep. 37–38, quoted at Zwanger Tr. 1499–1501; Tr. 2384–85).

The coup was successful, at least initially. (Tr. 101). When CRS took delivery of a Syntex System 60 head-only scanner (the "System 60") in June, 1976, Long Island had only one CAT scanner, at the North Shore Medical Center, and no private CAT scanners. Following on CRS' heels, however, Dr. Ernest Mandel ("Mandel"), and his Nassau CT Group also installed a scanner. (Arthur D. Little Rep. (PX 364) 32). Thereafter, in 1976 and 1977, six more units were installed in Nassau and Suffolk Counties. (Kveton Dep. 37–43; Arthur D. Little Rep. (PX 364) 32). Given the close-knit nature of the Long Island radiological community (Tr. 554–57; Kansler Dep. 30), CRS was aware, well in advance, that this competition was on its way.

CRS' rush to acquire a scanner was at least partially motivated by a desire to get one before Mandel. (Tr. 769, 808; 1501–02; 2384–85; Zwanger Dep. 37–38, quoted at Tr. 1501). Mandel's Nassau CT group, which had also bought a Syntex System 60 head-only scanner, and was located at Mineola, less than ten miles from CRS' Plainview facility (Kveton Dep. 89), was in close competition with CRS for referrals.

Mandel acknowledged this competition by attempting "to work out a deal with [Syntex service representative, Ferdinand Russo ("Russo")] . . . to work evenings, to obtain—so that we may come out with a tie, open the office at the same time . . . ." (Tr. 2385). As Russo put it, "[e]verybody wanted to be the first one on the block to have it." (Tr. 2384).

This drive to be the first is understandable. The patients of radiologists, such as the CRS doctors, come to them entirely by referrals from attending physicians. Given the difficulty of breaking up established referral patterns, "the potential share of the CT volume that could be expected in any market was dependent upon how early the hospital or private practice could offer CT scanning service." (Johnson Rep. 39).

Besides early delivery, another major goal of CRS in acquiring a scanner was to keep the price (including the initial deposit) down. Here, too, the Syntex scanner had an advantage over the competition: it required a deposit of only $10,000, as compared to EMI's down-payment of $100,000. (Kansler Dep. 39–40, quoted at Tr. 1050; Tr. 840–43). CRS hoped to make the smallest investment possible and to buy a unit that "could perform on a suitable level for a period of time, a couple of years, [so that] we could generate sufficient income to purchase another unit." (Zwanger Dep. 46, see Tr. 1439–40).

Of course, CRS wanted to buy a scanner that represented the state of the art in 1975. To CRS, this meant that the machine had to be able to do whole body scans and not be limited just to head scans. At the very least, CRS wanted a scanner that

could eventually be upgraded from head-only to whole-body scanning.

There was ample reason for Syntex to represent at the 1975 RSNA meeting that it could sell CAT Scanners that would scan the entire body. After all, their competitors (EMI, Ohio Nuclear, and Acta, to name a few) had whole-body scanners on the market by December, 1975. (See PX 364, at 12 and passim). Syntex placed on the floor of the 1975 Radiological Society meeting a Syntex System 60 "configured for whole body scanning." (Tr. 719). This was Syntex's corporate jargon for a scanner that appeared to be a whole-body scanner. As Sheldon Leonard, the former Syntex Sales Manager, testified in his deposition, the CAT Scanner Syntex displayed to the medical meeting was "mechanically a body scanner." (Leonard Dep., Vol. VI, at 63, 101). The unit on display had a wide aperture gantry, which suggested a body scanning capability. It did not contain a "water bag," which characterized the original EMI head scanner. (*Id.*)

Moreover, the System 60 was introduced at the 1975 RSNA as "A New CT Scanner For The Head And Body." (See PX 36, at 123). The materials distributed by Syntex at the meeting compared the Syntex equipment favorably with that of EMI, Ohio Nuclear and ACTA. In a matrix entitled, "Comparison of Tomographic Scanners" (PX 1A), Syntex compared the "Standard Design Features" of the various companies, stating that Ohio Nuclear, ACTA (Pfizer) and Syntex had "Dual-Purpose (head and body scanning) System[s] available." (*Id.*). Syntex's "standard unit—head and body" scanner was priced at $350,000 in comparison with the "head and body" units of Ohio Nuclear at $385,000 and ACTA at $340,000. Syntex also offered a "head only" unit for $295,000. (*Id.*).

In discussions at the meeting, representatives of Syntex stressed that the Syntex System 60 was truly a "system," and not simply a scanner. (Tr. 75). It was a whole body scanning system with a "modular systems design" which supposedly made the Syntex equipment superior to the body scanning units available from other manu-facturers. (PX 1B, 1C). The "modular systems design" overcame the obsolescence problem facing the purchasers of other manufacturers' equipment because the Syntex system was uniquely "upgradable." (Tr. 61–62, 75–76). This would allow the purchaser to keep pace with rapidly advancing technology at minimal expense. (See PX 1B, 1C).

The CRS doctors were advised that the CT equipment offered by Syntex had all the advantages of competitors' whole body scanners. It was a dual-purpose system, i.e., it possessed head and body capabilities. (PX 1A). While the clinical work to date had been limited to head scans, the Syntex System 60 had been designed as a body scanner, and the "computer software for the body scanning was being developed." (See PX 1B, at 6). The scanning time on the head work was being done at 60 seconds; that time would shortly be reduced to under 30 seconds for body work. (Tr. 62–64).

To protect a $50,000 discount that Syntex was offering to purchasers at the 1975 RSNA meeting, Syntex sales representative Oliver Wiley issued a quotation to Dr. Kansler during the meeting. (Tr. 82; see PX 9). This quotation, dated December 3, 1975, quoted the whole body system as follows:

| "Syntex 60 for Computerized Tomography of the Head | $297,000.00 |
| "Whole Body Scanning Adaptation Kit | $50,000.00 |
| "Total Price for the Scanner | $347,000.00 |

Under the $347,000 scanner quote were quotations for other "optional equipment." As Wiley testified, this quotation, like the one later issued to Dr. Kansler on December 16, 1975, was for a "whole body scanner." (Tr. 738–39). In response to a question as to why the scanner quotation was segmented in two items, "head" and "body adaptation," Wiley explained:

The way the System 60 works, you figure you could buy a head only unit or you could buy a total body unit or you could upgrade—it was strictly a market-

ing type of thing, so we could offer to somebody who was a neurologist a head unit and he would be perfectly satisfied. It was a marketing type thing.

Q. The only way to write an order for the whole body scanner at that time was to include both sections which equalled the body scanner?

A. That is correct.

Tr. 738.

Shortly after the RSNA meeting, Dr. Kansler and his CRS partners were invited to California for a two-day visit to Syntex's corporate headquarters. (Tr. 83, 1282). Dr. Kansler and Dr. Pesiri made the trip to Palo Alto on January 18, 1976. Mr. Edward Voboril, of Syntex, gave them a tour of the corporate research and development facilities. As the doctors noted, they were very impressed with both the research facilities and the "pure research" that was being done by Syntex. (Tr. 83, 1203–04).

On the second day of the visit, Voboril took the two doctors to the Syntex plant at Cupertino, California where the CT equipment was actually constructed. They saw several CT scanners in various stages of construction (Tr. 1287), and Sheldon Leonard gave a presentation about Syntex's "modular concept." (Tr. 84).

Finally, they were taken to the Palo Alto V.A. Hospital "to see a patient being scanned on the instrument." (Tr. 84). There, for the first time, the CRS doctors saw the Syntex System 60 "configured" as a head only scanner. (Tr. 85, 1286). Unlike the CT scanner on display at the RSNA meeting, however, the machine at the V.A. Hospital had a small aperture; and it had a "water bag" similar to that on the original EMI head scanner. (Tr. 85–86, 88) (One purpose of a water bag is to render the patient's head immobile while it is being scanned.).

When Dr. Kansler and Dr. Pesiri expressed their dismay at having been brought to California to see what they regarded as a primitive water bag head scanner, Syntex representatives explained that the water bag was only in the V.A. unit temporarily; and that the unit had been

"working" as a "whole body scanner," but that "minor technical problems" with the body capability had caused it to be "take[n] off line." (Tr. 89, 1286). According to Voboril, the water bag was to be removed shortly after the minor technical problems were resolved. (Tr. 1286, 89).

On the last evening in Palo Alto, Voboril took Drs. Kansler and Pesiri to dinner. In that final negotiation session (Tr. 90), Voboril discussed at length the attributes of the System 60. He told the doctors that the "basic system"—an "air scanning system"—would be delivered in "March or April." (Tr. 96). The "basic system" would provide air scanning of the head; a body scanning capability would be delivered to CRS "shortly" thereafter. Specifically addressing the question of scan time, Voboril told the doctors that the System 60 would either be delivered with a 30-second scan time or would "shortly" thereafter be converted to 30 seconds. (Tr. 91–92, 1289). According to Voboril, bringing the System 60 to 30-second scan time was a minor modification involving the change of a motor drive. Voboril indicated that a "Bodine" motor that had been obtained from Chicago would be used for that purpose and that the System 60 had been successfully tested at the 30-second scan time. (Tr. 1289).

Based upon Mr. Voboril's representations, then, Dr. Kansler and Dr. Pesiri, on January 19, 1976, at the Palo Alto restaurant where they were having dinner, gave Voboril a $10,000 down payment for the purchase of a Syntex System 60 whole body scanning system. That down payment was reflected in an update of the quotation of December 16, 1975, which shows Syntex received $10,000 against the $347,000 of the whole body scanner cost, leaving a balance of $337,000 due on the Syntex System 60 head and body scanner. (See PX 11).

The sales contract had already been signed by Dr. Kansler, for plaintiffs, on December 16, 1975. Under Paragraph 2 thereof it would become binding on defend-

ant when it was signed by Voboril; and this occurred on March 1, 1976.[2]

In mid-June 1976, Syntex delivered to CRS a small aperture, water bag, head scanner. Drs. Kansler, Pesiri and Zwanger testified about their anger and dismay in receiving, six months after their order, a water bag head scanner only. (Tr. 111–112, 1296–1297). All three doctors clearly understood from discussions with Ed Voboril, at the RSNA and, again, at Palo Alto, that the "basic system" was to be a wide aperture "air gap" scanner "configured" like the System 60 on display at the 1975 RSNA. As Dr. Pesiri testified:

> ... We were supposed to get an air bag scanner. [Kansler] was irate. He was livid. And a long discussion occurred which continued for a couple of days between Dr. Kansler, his associates, myself and Dr. Zwanger. And the question of what to do with the equipment. Dr. Kansler wanted to send it back immediately. And Dr. Zwanger and I argued against it. And in as much as it was in the suite and we had been committed to the medical community that we were getting a CAT scanner in the area, and we had some faith in the Syntex Corporation, and that perhaps this was a temporary thing because we had been told that this was going to be taken care of tomorrow.

(Tr. 1296).

After several days of debate on whether to reject the water bag head scanner (Tr. 112, 1296), the doctors reluctantly agreed to accept it, but only upon the express representations of Mr. Voboril that the water bag would be removed and air scan capacity would be delivered within a few weeks (Tr. 111–12, 767, 1297), and that body scanning would follow "shortly thereafter." (Tr. 112, 771). Unhappily, this was never to occur—hence, this litigation.

Sometime in 1976 it began to dawn upon Syntex that its future in the CAT scan industry was less than assured. As senior corporate officer with "line responsibility"

for Syntex's subsidiary, SAI (Tr. 235), Fulton Collins went to the 1976 RSNA meeting to "take a look at what was happening ... competitively" so he could "assess what our future course of action should be in our development program, as well as other strategic decisions for SAI." (Tr. 242). That meeting would prove to be a Rubicon in the Syntex CT effort.

Collins came away from the December 1976 RSNA meeting having concluded that (1) "the technological lead time that [Syntex] had had early had disappeared" (Tr. 243); and (2) Syntex's "share of the market had dropped significantly because it had not produced a body scan upgrade." (Tr. 244).

Collins also testified that only then did he realize "for the first time" (December 1976-January 1977) that Syntex was experiencing "development problems rather than logistical problems" in its CT development program. (Tr. 245). In Collins' opinion, Syntex, in December 1976–January 1977, "had only two choices: We either had to get out of the business ... or we had to pursue other means of selling equipment, and we chose the latter route." (Tr. 245).

The following September, Syntex decided to get out of the CAT Scan business entirely. Thereafter, it made no serious effort to achieve the thirty-second body scan capability. From that point, the System 60 was doomed to remain a sixty-second head scanner. It would have no effective body scanning capability. Moreover, the "modular" design of the "System with a Built in Future" had become meaningless.

Between the 1976 delivery and December 1978, the parties sought to resolve their differences. Plaintiff then brought this action to rescind the sales contract and to recover damages for breach of contract, breach of warranty and fraud in connection with Syntex's conduct in its dealings with plaintiff. In its complaint, plaintiff seeks to recover: $226,000 already paid to Syntex towards the purchase of the Syntex System

---

**2.** The contract (PX 11) contains a 1975 date under Vorboril's signature. This date is obviously a mistake, and should be 1976.

60; $500,000 in replacement costs to obtain equipment comparable to that which Syntex promised to deliver to plaintiff; $380,-000 in damages suffered incident to obtaining the replacement equipment; $780,000 in lost profits; $1,000,000 for damages to plaintiff's business reputation; and the return of $10,000 in service payments made to Syntex "under protest" during the course of this dispute.[3] Plaintiff also seeks appropriate punitive damages against Syntex, and suggests in its post-trial memorandum an award of $18,700,000 as punitive damages.

Defendant, in turn, counterclaims for the balance of the purchase price of the scanner and for payment of service charges allegedly owed by plaintiff. The amount defendant claims as owing on the purchase price is $71,000, the difference between the $226,000 paid by CRS and the $297,000 price for the System 60 Head Scanner, without the Whole Body Adaptation Kit. (See PX 11). The service charges demanded are $19,214.46, representing service provided by defendant to plaintiff between July 1977, when the one-year service warranty on the System 60 expired, and December 1978, when the parties stipulated to the Court that plaintiff thereafter would pay for maintenance services provided by defendant.

### Conclusions of Law

#### Fraud

Although the contract claim is governed by California law (by choice of the parties), a tort claim arising out of the contract may be governed by the law of a different forum. *Knieriemen v. Bache Halsey Stuart Shields Inc.*, 74 A.D.2d 290, 293, 427 N.Y.S.2d 10, 12–13 (1st Dep't 1980). California agrees. *See Consolidated Data Terminals v. Applied Digital Data Systems*, 708 F.2d 385 (9th Cir.1983).

It does not matter, however, whether New York or California law governs, because both states follow the common-law rule that to prevail on a fraud claim the plaintiff must prove scienter, i.e., that the defendant knowingly intended to deceive the plaintiff. *Simcuski v. Saeli*, 44 N.Y.2d 442, 377 N.E.2d 713, 406 N.Y.S.2d 259 (1978); *Crocker-Citizens National Bank v. Control Metals Corp.*, 566 F.2d 631 (9th Cir.1978). While New York requires that fraud be proven by clear and convincing evidence (*Accusystems, Inc. v. Honeywell Information Systems, Inc.*, 580 F.Supp. 474, 482 (S.D.N.Y.1984)), and California appears satisfied with a mere preponderance of the evidence (*Liodas v. Sahadi*, 19 Cal.3d 278, 562 P.2d 316, 137 Cal. Rptr. 635 (1977)), the matter should be governed by New York law. *Fitzpatrick v. International Ry. Co.*, 252 N.Y. 127, 169 N.E. 112 (1929); Restatement (Second) of Conflict of Laws § 133 (1969); R. Leflar, *The Law of Conflict of Laws* § 63 (1959). In any event, the point is academic because I find that plaintiff has not proven scienter by a preponderance of the evidence, let alone by clear and convincing evidence.

CRS' principal claims of misrepresentation appear to be that Syntex stated that it was "committed" to its CT program, and that the System 60 was an "upgradable" CAT scanner with "a built-in future." Additionally, CRS contends that Syntex promised the System 60 would have various features that it did not have, and would perform scans in less than 60 seconds, which it never could. Thus, CRS anchors its fraud claims upon representations as to the future development of new and improved features for the System 60. The question of law, therefore, distills to whether Syntex, at the time of the contract, had a good faith belief that it could develop such features.

**3.** In its post-trial memorandum, plaintiff suggested a damage award that substantially reflected the demands made in the complaint, with two exceptions: (1) the demands for $380,-000 in costs incident to replacing the scanner and $780,000 in lost profits were replaced by a demand for $2,230,800 in lost profits; and (2) the demand for refund of service charges had been raised to $24,936.80. Rule 15(b), Fed.R. Civ.P., specifically provides that pleadings may be amended to conform to the proof adduced at trial. In any event, the difference is academic because of my findings as to the damages plaintiff may recover.

I find that at the time of the contract: Syntex had developed a prototype System 60 and had installed and tested it at the V.A. hospital in a relatively short period of time; Syntex was optimistic about its ability to compete successfully in the volatile CT market; Syntex had enjoyed considerable success in developing and marketing X-ray crystallography equipment incorporating technology similar to that required for CAT scanners; Syntex had assembled a talented group of scientists and technicians to develop the System 60; Syntex had adequate facilities for manufacturing the System 60; and Syntex alone of all CT manufacturers had developed a modular system designed to permit upgrading of any one of the three separate functions of the System 60 without having to replace the equipment for the other functions. Accordingly, Syntex had good reason to believe that it would be able to produce improved features for the System 60 and to keep abreast of whatever future technological advances occurred in CAT scanners. Under these circumstances, CRS' claims based on fraud and misrepresentation must fail.

Syntex's commitment to its CT program when it entered into the contract with CRS was sincere. Its ultimate failure in this field cannot reasonably be attributed to a lack of such commitment. Indeed, the undisputed expert testimony amply demonstrated the high mortality rate among the early manufacturers of CAT scanners. In January 1976 CAT scanners could be ordered from seven manufacturers. (Defendant's Exhibit ("DX") SSSSSS, at 60). By January 1981 many of these manufacturers had withdrawn from the CT market in the United States. (*Id.* at 45–46).

At worst, Syntex was guilty of misguided optimism. This is the stuff of a contract claim, not fraud.[4] Arguably, a defendant may be held liable in fraud for representing that he intends to perform an act in the future when he actually harbors no such intention. *See Stahl v. Management Corp. v. Conceptions Unlimited*, 554 F.Supp. 890, 894 (S.D.N.Y.1983); *Brown v. Lockwood*, ·76 A.D.2d 721, 731–32, 432 N.Y.S.2d 186, 194 (2d Dep't 1980). The evidence here, however, establishes that Syntex had every intention of succeeding with its CT program.

Any inference to be drawn from the fact that Syntex failed is insufficient to sustain CRS' burden of showing a false statement of intention by Syntex. *Id.* at 732–33, 432 N.Y.S.2d at 195 ("Where the only proof is that the defendant failed to keep his promise, it is insufficient to establish that the defendant did not intend to perform at the time the promise was made.... Fraudulent intent not to perform a promise cannot be inferred merely from the fact of nonperformance."); *accord Stahl Management Corp. v. Conceptions Unlimited, supra,* 554 F.Supp. at 894.

In an analogous situation, where a plaintiff's allegations of fraud were based upon representations as to what certain machines, not yet manufactured, would accomplish, the Court in granting the defendant summary judgment stated:

[I]t is apparent that these so-called representations were really predictions as to the capabilities and qualities of equipment to be manufactured. A failure to live up to the specifications would in ordinary circumstances be a breach of warranty or of the contract. It would

---

4. For reasons that are not entirely clear there is a pronounced tendency in computer-related litigation for plaintiffs to ignore centuries of common-law history distinguishing contract from tort theories. A Special Committee on Computers (of the Association of the Bar of the City of New York) recently concluded:

The Committee feels that it is important to maintain the traditional distinctions between the law of tort and contract. In the area of commercial transactions, the bargaining principle should be controlling. Since tort theo-

ries (other than traditional fraud) interfere with and upset the bargaining principle, they should not be countenanced. No valid reasons appear to justify removing computer system acquisitions from the ambit of these general principles. Accordingly, the Committee recommends that the courts restrict commercial plaintiffs to their contract remedies.

The Record of the Association of the Bar of the City of New York, Vol. 38, No. 5, at p. 442 (October 1983).

only become fraudulent if the maker knew that the machines would not so perform.

*B.V.D. Co. v. Marine Midland Bank*, 46 A.D.2d 51, 54, 360 N.Y.S.2d 901, 904 (1st Dep't 1974).

*Contract*

Plaintiff's alternative theory of liability is breach of contract. There is a written sales agreement between the parties (PX 11), but plaintiff strenuously urges that there were oral promises that never found their way into the contract and, therefore, that the written agreement is not the entire agreement. Not surprisingly, defendant rests foursquare on the written terms of the contract as the only promises it made.

### 1. Partial Integration

■ Paragraph 17 of the sales contract expressly states that "this contract shall be construed in accordance with the laws of the State of California," and both sides agree that California law controls. The choice of law, however, is of no particular significance because both California and New York have adopted the Uniform Commercial Code without substantial variation. Cal.U.C.C. (West 1964); N.Y.U.C.C. (McKinney 1964). And there is no question that the Code applies to the sale of high technology equipment. *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737 (2d Cir.1973) (sale of computer).

■ Plaintiff's Exhibit 11 is the contract of sale. Characterizing this document as a "complete and exclusive statement of the terms of the agreement," Syntex invokes U.C.C. § 2–202, the Code's parol evidence rule, to bar plaintiff from adding terms to the contract. That section provides:

Terms ... set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

. . . . .

(b) by evidence of consistent additional terms unless the court finds the writing

to have been intended also as a complete and exclusive statement of the terms of the agreement.

U.C.C. § 2–202(b).

There are numerous flaws in defendant's argument. First, nowhere in the contract is there explicit language of merger or integration stating that the sales contract is the "complete and exclusive statement" of the agreement between the parties. *Cf. FMC Corp. v. Seal Tape Ltd.*, 90 Misc.2d 1043, 1044, 396 N.Y.S.2d 993, 994 (Sup.Ct. Queens Co.1977) ("[This] order constitutes the entire agreement between Seller and Buyer;" buyer barred from introducing parol warranties).

Second, and more important, the agreement is manifestly not complete on its face. Paragraph 7 of the contract, for example, states that

The Equipment supplied will be generally in accordance with the written Specifications, as provided by SYNTEX to Purchaser, subject to reasonable deviations.... SYNTEX shall not be responsible for performance figures given in any source other than the above mentioned specifications ....

Both sides agree that at least some of these "written Specifications" (Syntex claims that these are all of them) are contained in Plaintiff's Exhibit 7, which, of course, is not part of the contract proper. That exhibit is a sales brochure describing the System 60 as an upgradable "full body scanner," ... "designed to meet your long term needs." The brochure shows the System 60 to be a "wide aperture" whole body scanner, "configured" as was the scanner at the 1975 RSNA meeting. It further describes the System 60 as a whole body scanner designed to meet the purchaser's "needs for the future."

When an agreement explicitly refers to secondary documents not contained therein, the agreement cannot be deemed to have been intended by the parties to be a complete and exclusive statement and thus may be supplemented by evidence of consistent additional terms. *In re W.T. Grant Co.*, 1 B.R. 516, 519 (S.D.N.Y.1979). Be-

cause it is clear that the contract of sale, Plaintiff's Exhibit 11, is not complete on its face, I hold that it was not intended as the complete and exclusive statement of the terms of the agreement between CRS and Syntex. U.C.C. § 2–202(b). Accordingly, plaintiff may introduce consistent additional terms to supplement the agreement, including evidence of express warranties made outside the contract. *Id.; see* J. White & R. Summers, *Uniform Commercial Code* §§ 2–10, 12–4 (2d ed. 1977).

### 2. Express Warranties

▇▇▇▇ The purpose of the law of warranty is to "determine what it is that the seller has agreed to sell." U.C.C. § 2–313 official comment 4. Express warranties are created by any affirmation of fact or promise that relates to the contract and that becomes part of the basis of the bargain. Cal.U.C.C. § 2313(1)(a) (West 1964); U.C.C. § 2–313(1)(a) (1977); *Price Brothers Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 422 (6th Cir.), *cert. denied*, 454 U.S. 1099, 102 S.Ct. 674, 70 L.Ed.2d 641 (1981); *McGregor v. Dimou*, 101 Misc.2d 756, 760, 422 N.Y.S.2d 806, 810 (Civ.Ct.N.Y.Co.1979). Affirmations by the seller regarding the goods made in the course of a bargain become part of the description of the goods. U.C.C. § 2–313 official comment 3; *see Alan Wood Steel Co. v. Capital Equipment Enterprises, Inc.*, 39 Ill.App.3d 48, 349 N.E.2d 627 (1976).

It is not unusual to find express warranties in sales literature, brochures, and advertisements. *See, e.g., Community Television Services, Inc. v. Dresser Industries*, 586 F.2d 637, 640 (8th Cir.1978) (statements in advertising catalog supplementing specifications in the contract could be found to be an affirmation of fact or promise); *Fargo Machine & Tool Co. v. Kearney & Trecker Corp.*, 428 F.Supp. 364, 371 (E.D. Mich.1977) ("It is clear that advertisements and promotional literature can be a part of the basis of the bargain when they are prepared and furnished by a seller to induce purchase of its product and the buyer relies on the representations.").

▇▇▇▇ The evidence persuades me that in discussions between Syntex and CRS, Syn-

tex represented that its System 60 was upgradable and it would soon be provided with air scanning, body scanning, 30 seconds or less scan time, a 5 mm. collimator, sagital and coronal reconstruction capabilities, and therapy planning software. This is consistent with statements made in defendant's sales brochure claiming that the System 60 "is designed with the future in mind" and that it could be expanded "to accomodate future improvements so that you do not have to risk a major investment on unproven body scan technology. With System 60, new functions and features can be added, without changes to the basic system . . . ." (PX 7).

I find, therefore, that the oral affirmations of fact and the oral promises made by defendant during the bargaining process as well as the written representations in defendant's sales brochure created express warranties that were part of the "fabric" of the agreement between the parties. *See Community Television Services, Inc. v. Dresser Industries, supra*, 586 F.2d at 640; U.C.C. § 2–313 official comment 3.

Defendant contends that even if these representations amounted to warranties, they are, nevertheless, unenforceable because they are inconsistent with the contract. Specifically, defendant wraps itself in paragraph 10 of the contract, a disclaimer clause.

Paragraph 10 of the contract contains a one-year warranty against defects in materials and workmanship, and purports to exclude other warranties in the following language:

No other warranty except Title to Materials furnished shall be *implied* with respect to this order, and this warranty is expressly in lieu of all other obligations or liabilities on the part of SYNTEX (emphasis added).

The issue is whether this language effectively blocks the creation of other warranties. I hold that it does not.

The U.C.C. provides:

Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit

warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this Article on parol or extrinsic evidence (Section 2–202) negation or limitation is inoperative to the extent that such construction is unreasonable.

Cal.U.C.C. § 2316(1) (West 1964); N.Y.U. C.C. § 2–316(1) (McKinney 1964).

Courts construing this section have held that when words of warranty and disclaimer cannot be reconciled, then under the U.C.C. the warranty language prevails. *Consolidated Data Terminals v. Applied Digital Data Systems, Inc.*, 708 F.2d 385, 391 (9th Cir.1983); *Wilson Trading Corp. v. David Ferguson, Ltd.*, 23 N.Y.2d 398, 405, 244 N.E.2d 685, 689, 297 N.Y.S.2d 108, 113 (1968). No such conflict exists here, however, because the disclaimer clause and ·defendant's pre-contract parol warranties can be reconciled.

■ Disclaimers are strictly construed. *Arnold v. New City Condominium Corp.*, 78 A.D.2d 882, 882, 433 N.Y.S.2d 196, 198 (2d Dep't 1980), *appeal dismissed*, 53 N.Y.2d 823, 422 N.E.2d 582, 439 N.Y.S.2d 922 (1981). Properly read, Paragraph 10 is an attempt to disclaim implied warranties; it clearly states that "[n]o other warranty except Title to Materials furnished shall be *implied* with respect to this order...." Paragraph 10 does not even mention express warranties.

■ A parol term is inconsistent with a written contract term when it contradicts or negates the written term; anything less is not inconsistent. *Whirlpool Corp. v. Regis Leasing Corp.*, 29 A.D.2d 395, 398, 288 N.Y.S.2d 337, 339 (1st Dep't 1968); *Hunt Foods & Industries v. Doliner*, 26 A.D.2d 41, 43, 270 N.Y.S.2d 937, 940 (1st Dep't 1966). It is evident that proof of express warranties is not inconsistent with a disclaimer of implied warranties.

This accords with the Code's general approach of protecting a buyer who has relied upon express warranties: They "rest on 'dickered' aspects of the individual bargain, and go so clearly to the essence of that bargain that words of disclaimer in a form are repugnant to the basis of dickered terms." U.C.C. § 2–313 official comment 1. To agree with defendant that its boiler plate language about implied warranties bars proof of express warranties made before plaintiff signed that form, would be to reweave the fabric of the agreement to suit defendant's own ends. This I cannot do.

I find, therefore, that Syntex committed itself to deliver to CRS a "modular" scanning system with "air" head and body scanning capabilities, and with the following attributes: a thirty-second or less scan time; air scanning (scanning without a water bag); a narrow (5mm) collimator for orbit examinations; sagital and coronal reconstruction capabilities; and therapy planning software. (*See* PX 35, 63, 149, 349). The Syntex System 60, delivered to CRS in June 1976, substantially failed to meet the foregoing requirements. Syntex is, therefore, liable for breach of express warranty.

### 3. Implied Warranties

Plaintiff also alleges that defendant, by delivering an inferior scanner, has breached implied warranties of merchantability and fitness for a particular purpose. Defendant counters that even if such warranties existed, paragraph 10 of the sales contract, which admittedly refers to implied warranties, effectively disclaimed them. I find that although defendant did not breach the warranty of merchantability, it did breach the warranty of fitness for a particular purpose, and that the attempted disclaimer of liability for that breach is inoperative.

### A. *Merchantability*

The implied warranty of merchantability is found in section 2–314 of the Code, which provides that "[u]nless excluded or modified, ... a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Plaintiff must prove that the scanner delivered by Syntex was not merchantable at the time of sale. *See* J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 9–6, at 343 (2d ed. 1980).

■ Subsection (2) of 2–314 contains a convoluted definition of merchantability that distills to the following proposition: goods are merchantable if they are of average quality. *Nassau Suffolk White Trucks, Inc. v. Twin County Transit Mix Corp.*, 62 A.D.2d 982, 984, 403 N.Y.S.2d 322, 325 (2d Dep't 1978) ("merchantable does not mean perfect"); *Schwartz v. Macrose Lumber & Trim Co.*, 50 Misc.2d 547, 552, 270 N.Y.S.2d 875, 883 (Sup.Ct.Queens Co.1966) ("of medium quality"), *rev'd on other grounds*, 29 A.D.2d 781, 287 N.Y. S.2d 706 (2d Dep't 1968), *aff'd*, 24 N.Y.2d 856, 248 N.E.2d 920, 301 N.Y.S.2d 91 (1969). In other words, merchantability refers to whether the goods in question are fit for the "ordinary" purpose for which such goods are generally used. Cal.U.C.C. § 2315 official comment 2.

■ Plaintiff has failed to prove that the scanner it bought from Syntex could not be used for ordinary purposes. Indeed, whatever else may be said about the System 60, it is unquestionably average. Perhaps the most salient proof of this is Dr. Kansler's own admission that the System 60 "functioned adequately as a head scanner." (Tr. 1139). It is, therefore, a merchantable head scanner. Whether the System 60 did not do what plaintiff claims it was supposed to do relates to a breach of implied warranty for fitness for a particular purpose, a different subject to which I now turn.

## B. *Fitness for Particular Purpose*

An implied warranty of fitness for a particular purpose arises when "the seller at the time of contracting has reason to know any particular purpose for which goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods...." Cal.U.C.C. § 2315 (West 1964), N.Y.U.C.C. § 2–315 (McKinney 1964); *see Agricultural Services Association, Inc. v. Ferry-Morse Seed Co.*, 551 F.2d 1057, 1065 (6th Cir.1977) (applying California law).

■ Syntex sold the System 60 in early 1976 as a "new CT scanner for the head and body." (See PX 36, at 123). When Syntex sold the System 60 to CRS as a whole body scanner, it knew that the doctor-purchasers intended to use the equipment for body and head scanning.

It is undisputed that Syntex was aware in 1976 that effective body scanning required a "scan time" within the limits that a patient could hold his breath without moving. The parties understood that the System 60 would provide that capability by allowing "air" body scanning in "30 seconds or less." The equipment that Syntex delivered had neither air nor body scanning capability; nor could it scan within 30 seconds. These defects were never satisfactorily remedied by Syntex.

Syntex knew that CRS needed the Scanner for a particular purpose and that CRS was relying on Syntex's "skill or judgment" to furnish it with suitable goods. Consequently, Syntex breached its implied warranty that its goods were fit for a particular purpose.

■ Syntex again falls back upon paragraph 10 of the sales contract, arguing that paragraph 10 disclaims the warranty of fitness for a particular purpose. I hold that it does not.

Section 2–316(2) of the U.C.C. provides: Subject to subsection (3) [not applicable here], ... to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

The Code defines "conspicuous" as: so written that a reasonable person against whom it is to operate ought to have noticed it .... *Language in the body of a form is 'conspicuous' if it is in larger or other constrasting type of color* .... Whether a term or clause is 'conspicuous' or not is for decision by the court.

U.C.C. § 1–201(10) (emphasis added).

The only words in the contract printed in "larger or other contrasting type or color"

are the headings of each section and the word "SYNTEX" wherever used. Paragraph 10 does contain the sentence, "No other warranty except Title to Materials furnished shall be implied with respect to this order," but it is written in small letters and buried within the body of the paragraph. I hold, therefore, that the attempt by Syntex to disclaim the warranty of fitness for a particular purpose is ineffective. *Cf. Earman Oil Co. v. Burroughs Corp.*, 625 F.2d 1291, 1294 n. 6, 1298 (5th Cir.1980) (disclaimer in larger type and explicit reference to warranty of fitness for a particular purpose); *Bakal v. Burroughs Corp.*, 74 Misc.2d 202, 204, 343 N.Y.S.2d 541, 543 (Sup.Ct. Schenectady Co. 1972) (same); *Commercial Credit Corp. v. CYC Realty, Inc.*, 102 A.D.2d 970, 477 N.Y.S.2d 842, 844 (3d Dep't 1984) (same).

### Damages

Having found defendant liable for breach of express and implied warranties, I turn finally to the question of damages. As noted earlier, plaintiff seeks the usual panoply of tort and contract damages, including a substantial award of punitive damages.

### 1. Punitive Damages

■ Plaintiff may not recover punitive damages. Section 1–106 of the Code prohibits "penal damages ... except as specifically provided in this Act or by other rule of law." The Code's sections governing damages for breach of warranty (§§ 2–714, 2–715) do not provide for punitive damages. *See Novosel v. Northway Motor Car Corp.*, 460 F.Supp. 541, 545 (N.D.N.Y. 1978). Neither California nor New York courts would award punitive damages for a mere breach of warranty, absent evidence that the conduct constituting the breach was so malicious or morally culpable that it constituted a tort in and of itself. *See Consolidated Data Terminals v. Applied Digital Data Systems*, 708 F.2d 385, 399 (9th Cir.1983); *Meinrath v. Singer Co.*, 482 F.Supp. 457, 461 (S.D.N.Y.1979), *aff'd mem.*, 697 F.2d 293 (2d Cir.1982); *Novosel v. Northway Motor Car Corp., supra*, 460 F.Supp. at 545; *Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 358, 353 N.E.2d 793, 795, 386 N.Y.S.2d 831, 833 (1976). I have already concluded that defendant is not liable for fraud, and there is no evidence whatsoever that defendant's conduct surrounding its breaches of warranties was malicious or morally culpable. Plaintiff's request for punitive damages is denied.

### 2. Damages for Breach of Warranty

Plaintiff also seeks damages for the costs of replacing the scanner, money expended on repairs, and return of its down payment. Additionally, plaintiff seeks damages for lost profits and injury to its business reputation. Whether and to what extent these damages are recoverable are troublesome questions. They need not be addressed, however, because the sales contract contains express limitations on plaintiff's remedies in the event of a breach of warranty by Syntex.

Taking a belt-and-suspenders approach to limiting its liability, Syntex inserted two clauses in paragraph 10 of the sales contract limiting plaintiff's remedies in the event of a breach by Syntex. The first clause follows a one-year warranty against defects in materials and workmanship, and provides that "the liability of SYNTEX under *this* Warranty may, at the election of SYNTEX, be limited to the correction of such defect or defects or to the replacement of the part or parts in which such defects appeared." (PX 11, at ¶ 10) (emphasis added).

The second clause follows the general disclaimer clause discussed above, and states that "[t]he liability of SYNTEX for breach of warranty shall, in any case, be limited to the total amount paid by Purchaser for material furnished and work performed under this order and SYNTEX shall not be liable for incidental or consequential damages, loss of profit or loss of use." (*Id.*) These two clauses effectively limit plaintiff's remedies unless either the clauses are unconscionable or the prescribed remedy fails of its essential purpose. U.C.C. § 2–719.

■ Plaintiff argues that the limitation clauses are unconscionable because they

are not conspicuous. While conspicuousness is a factor to consider when examining a clause for unconscionability, *Fleischmann Distilling Corp. v. Distillers Co.*, 395 F.Supp. 221, 232 (S.D.N.Y.1975), it is not a sine que non. Neither § 2–719 nor its Official Comments, require that the language be conspicuous. U.C.C. § 2–719 official comments; *Fargo Machine & Tool Co. v. Kearney & Trecker Corp.*, 428 F.Supp. 364, 381 (E.D.Mich.1977).

■ Plaintiff also argues that the clauses are unconscionable because of the disparity in bargaining positions of the parties. This too should be considered. U.C.C. § 2–302 official comment 1. Here, however, any disparity that may exist is far less glaring than in most sales contracts. Indeed, the contract contains a clause, inserted *at plaintiff's insistence*, that the purchase was "subject to approval of all other stockholders, *and attorneys*" of plaintiff. (PX 11) (emphasis added). The clauses limiting plaintiff's remedies cannot realistically be held unconscionable.

■ Plaintiff contends that, even if it is not unconscionable, the language in the first clause limiting Syntex's liability to repair or replacement of the equipment fails of its essential purpose. A limited remedy fails of its essential purpose when the circumstances existing at the time of the agreement have changed so that enforcement of the limited remedy would essentially leave plaintiff with no remedy at all. *See Wilson Trading Corp. v. David Ferguson, Ltd.*, 23 N.Y.2d 398, 404–05, 244 N.E.2d 685, 688, 297 N.Y.S.2d 108, 113 (1968); J. White & R. Summers, *supra*, § 12–10. In such a case, the limited remedy clause is disregarded and the full arsenal of Code remedies becomes available to plaintiff. U.C.C. § 2–719(2); *Wilson Trading Corp. v. David Ferguson, Ltd., supra*, 23 N.Y.2d at 404, 244 N.E.2d at 688, 297 N.Y.S.2d at 112. As Official Comment 1 to section 2–719 states, "it is of the very essence of a sales contract that at least minimum adequate remedies be available."

■ Assuming plaintiff is correct that the first limitation-of-remedy clause does fail of its essential purpose, plaintiff still gets the benefit of the money damage remedy provided in the second clause. Even though an exclusive remedy is stricken because it fails of its essential purpose, that does not mean that all limitations must be stricken. As the Court stated in *County Asphalt, Inc. v. Lewis Welding and Engineering Corp.*, 323 F.Supp. 1300, 1309 (S.D.N.Y.1970), *aff'd*, 444 F.2d 372 (2d Cir.), *cert. denied*, 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971), "[a] better reading is that the exclusive remedy clause should be ignored; other clauses limiting remedies in less drastic manners and on different theories would be left to stand or fall independently of the stricken clause." The second clause, limiting plaintiff's recovery to the price paid for the System 60, affords plaintiff the adequate remedy required by the Code. *See American Electric Power Co. v. Westinghouse Electric Corp.*, 418 F.Supp. 435, 458–59 (S.D.N.Y.1976); *County Asphalt, Inc. v. Lewis Welding & Engineering Corp., supra*, 323 F.Supp. at 1309. The outside limit upon plaintiff's recovery, therefore, is the total amount ($226,000) it has paid to Syntex.

■ The parties disagree strongly as to how the damages in this action should be measured. Plaintiff contends that it has effectively revoked acceptance of the scanner, U.C.C. § 2–608, and is entitled to cancel the contract and recover the purchase price as well as incidental and consequential damages. This, if available, is the Code's version of the common-law remedy of rescission. *See* J. White & R. Summers, *supra*, § 8–1, at 293–95 & nn. 8–13. Defendant counters that plaintiff did not effectively revoke acceptance, and, thus, is limited to the damages prescribed by § 2–714(2), the difference between the value of the scanner as accepted and its value had it been as warranted (subject, of course, to the limitation in paragraph 10).

Section 2–608 provides that the "buyer may revoke acceptance of a commercial unit whose non-conformity substantially impairs its value to him if he had accepted it ... on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured," or where acceptance was "reasonably induced ... by

the seller's assurances." Subdivision (2) of § 2–608 then provides that "revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it .…" Plaintiff's June 22, 1978 letter revoking its acceptance (PX 35) complied with both subdivisions of § 2–608.

Plaintiff accepted the scanner on July 19, 1976 with the express assurances of defendant that the non-conformity in the scanner would be cured "shortly." (PX 135, at 4, 241, 290, 332; Tr. 1790). Defendant concedes that it gave these assurances. (Tr. 266; Defendant's Post-Trial Memorandum 62–64). It contends, nevertheless, that the defects in the scanner did not "substantially impair" its value to plaintiff, and that by keeping and continuing to use the scanner, plaintiff never properly revoked acceptance.

All of the credible evidence persuades me that there was a substantial impairment in the value of the scanner and that plaintiff acted reasonably by continuing to use the scanner in the face of defendant's repeated assurances that it would soon be made to conform to specifications. There is ample evidence that for plaintiff to maintain a competitive position among Long Island radiologists, it had to have a scanner that could perform whole body scans quickly. Plaintiff could not do that with the System 60. Nevertheless, given the long lead time from order of a scanner to its delivery—in many instances up to one year—as well as the competition plaintiff faced from other radiologists, using the non-conforming scanner as best it could was the only reasonable thing for plaintiff to do. Here, continued use was the only reasonable way to mitigate damages. *See Fargo Machine & Tool Co. v. Kearney & Trecker Corp.,* 428 F.Supp. 364, 378 (E.D.Mich.1977). As the Court recognized in that case:

> [C]omplicated machinery and systems may have relatively long ironing out peri-

ods during which the buyer in good faith continuously attempts to have the seller cure or repair complicated problems. Accordingly, courts have held that revocation in such circumstances is not unreasonably delayed where buyer promptly notifies seller of the defects, attempts at cure are ongoing, and buyer does not formally notify of revocation until it is apparent that seller cannot perform repairs.

*Id.* at 379 (citing cases).

Accordingly, I hold that plaintiff effectively revoked its acceptance within the meaning of § 2–608, and is entitled to the remedies afforded a buyer who revokes under that section.

■ Sections 2–711 and 2–712 prescribe the remedies normally available to a buyer who revokes acceptance: the buyer may cancel the contract, recover the purchase price, and recover the cost, above the contract price, of purchasing replacement goods, as well as incidental and consequential damages. In light of my holding regarding plaintiff's maximum recovery, however, it is clear that plaintiff's recovery is limited to the amount it paid defendant for the System 60 scanner ($226,000). By "cancelling" the contract, of course, plaintiff must return the scanner to defendant.

■ Defendant contends that plaintiff's recovery must be reduced by the fair rental value of the scanner since the date of acceptance, in order to fairly compensate defendant for the benefit plaintiff derived from the use of the scanner. No provision for such a set-off is found in Article 2, but its use is recommended to avoid unjustly enriching the buyer at seller's expense. 3 W. Hawkland, *Uniform Commercial Code Series* § 2–608:04, at 91 & nn. 6–7 (1982) (citing cases and commentators). No credible evidence was adduced at trial, however, to support such a set-off.[5] Accordingly, defendant's request is denied.

---

5. The only evidence adduced at trial concerning the reasonable rental value of the scanner was during the testimony of defendant's expert, Dr. Jerry Lloyd Johnson. Dr. Johnson testified that the cost of renting for 3½ years the scanner purchased by plaintiff was $400,000, plus inter-

est. (Tr. 2738–40). This is greater than the price of purchasing the System 60 outright—$297,000—as well as the price of comparable scanners available in January 1976. (Johnson Rep. 58–59). I find this testimony incredible.

*Syntex's Counterclaims*

Syntex has been found liable for breach of express and implied warranties and owes plaintiff the total amount paid by plaintiff for the CAT Scanner. It follows that Syntex may not recover for the amount still owed by CRS on the original purchase price.

■ As to the service charges that defendant seeks to recover, I find that CRS accepted delivery of the scanner as operational on July 19, 1976, and was apprised (and agreed in writing) at the time that the warranty period had begun to run. (Tr. 2391; DX LLLLLL [6L]). The evidence showed that Syntex continued to service the CRS scanner from July 1977 through December 1978; and, except for $10,000 paid "under protest," CRS did not pay for such service. Syntex charged the market rate for those services. (Tr. 2403–2411). CRS expressly conceded during the trial that the service by Syntex was excellent. (Tr. 559, 1362, 1377). Therefore, I find that CRS owes Syntex an additional $19,214.46 for charges for services rendered and parts provided to CRS during the period of July 19, 1977 through December 1978, beyond the $10,000 it has already paid.

In sum, then, plaintiff shall recover from defendant $226,000, plus interest from the date of revocation of acceptance, less $19,155.46, plus interest from July 1977 through December 1978. The parties are directed to submit proposed orders and judgments consistent with this Opinion not later than November 15, 1984.

SO ORDERED