### COMPUTERIZED RADIOLOGICAL SERVICES, Plaintiff-Appellee, Cross-Appellant,

v.

### SYNTEX CORPORATION and Syntex Analytical Instruments, Inc., Defendants-Appellants, Cross-Appellees.

Nos. 1327, 1328, Docket 85–7156, 85–7198.

United States Court of Appeals, Second Circuit.

Argued June 13, 1985.

Decided March 13, 1986.

Norman Solovay, New York City (Kathy Dutton Helmer, Holtzmann, Wise & Shepard, New York City, of counsel), for defendants-appellants, cross-appellees.

Paul F. Corcoran, Mineola, N.Y. (Speno Goldberg Moore Margules & Corcoran, P.C., Mineola, N.Y., of counsel), for plaintiff-appellee, cross-appellant.

Before FRIENDLY,\* OAKES and WINTER, Circuit Judges.

WINTER, Circuit Judge:

This is an appeal by the defendants from a decision ordering the rescission of a sales contract for a CAT scanner and return of the purchase price. A cross-appeal was also taken by the plaintiff from the district court's rejection of its fraud claims and

\* Judge Friendly participated in oral argument and concurred in this opinion before his death

from various other rulings. We reverse the rescission of the contract on the grounds that plaintiff's revocation of acceptance was invalid, and remand for further proceedings with regard to the fraud claim and for a recalculation of damages. In all other respects the district court is affirmed.

## BACKGROUND

Assuming a familiarity with the comprehensive opinion of the district court, *Computerized Radiological Services, Inc. v. Syntex Corp.*, 595 F.Supp. 1495 (E.D.N.Y. 1984), we limit ourselves to an outline of the facts and those issues on appeal that warrant discussion.

Defendants Syntex Corporation and Syntex Analytical Instruments, Inc. ("Syntex") began manufacturing CAT scanners in 1975. Plaintiff Computerized Radiological Services ("CRS") is a group of Long Island radiologists formed in 1975 for the purpose of buying a CAT scanner. The CRS group wanted to be the first radiologists on Long Island to offer CAT scanning. In November, 1975, the Radiological Society of North America ("RSNA") held a meeting in Chicago that featured CAT scanner exhibits, and three CRS principals attended, at least one of whom was knowledgeable in CAT scanning equipment. CRS was interested in obtaining a scanner with full-body scanning capability. At the time, there were available first generation waterbag head scanners (with small apertures for head-only scanning) and some second generation full-body air scanners of varying efficiency (with wide apertures to accommodate the whole body).

At the RSNA meeting, the doctors from CRS viewed Syntex scanners and met with representatives of Syntex. In advertisements and through representatives at the RSNA meeting, Syntex described its "System 60" as an upgradable unit designed for full-body scanning. Syntex conceded that

on March 11, 1986.

its scanner was currently doing only 60-second head scans, but represented that it would be soon capable of 30-second full body scans, after the necessary computer software was fully developed. This reduction in time was considered necessary in view of the effect of body movement over a 60-second period upon the scanner's performance. As technology developed, it later became apparent that 30 seconds was also too long a period for effective body scans.

CRS focused its interest on the Syntex scanner because it would be delivered sooner than competing models, was cheaper, and required a smaller deposit. In January, 1976, several members of the group went to Syntex's California headquarters, toured the facility, and saw the System 60 CAT scanner in operation at a Veteran's Administration hospital. However, the scanner displayed there was a first generation waterbag head scanner. A Syntex representative explained to the doctors that the waterbag was only a temporary measure. He stated that the unit had been working as a whole-body scanner but that, because of minor technical problems, the body scanner part had been removed. He indicated it would be reinstalled as soon as these problems were resolved. It appears that these statements were untrue and that no Syntex scanner in fact operated as a whole-body scanner before March, 1976. The CRS doctors proceeded to finalize their agreement at the end of their California visit with a cash deposit of $10,000. The cost of the scanner was $297,000 for the head scanner and $50,000 for the body scanning adaptation kit to arrive later.

In July, 1976, the CRS doctors received a small aperture waterbag head scanner from Syntex, which they accepted only after receiving assurances that it would be updated "shortly" to full body air scanning capability. Syntex had reason to believe at that time that it could develop the technolo-gy necessary for updating the System 60. Unfortunately, Syntex lost the technological race to its competitors and in September, 1977, abandoned its attempts to upgrade the System 60 CAT scanner. As a result, in January, 1978, Syntex offered CRS a 60-second body scanner addition that was relatively worthless and that CRS refused to accept. CRS formally revoked acceptance of the head scanner in a letter dated June 22, 1978. However, it continued to use the machine for another 22 months until a Picker Scanner was installed as a replacement in April, 1980.

CRS brought this diversity action against Syntex in December, 1978. It sought rescission and damages for breach of contract, breach of warranty and fraud. Syntex counterclaimed for the unpaid purchase price and unpaid bills for services rendered after the warranty on the equipment had expired.

The district court rejected CRS' fraud and breach of warranty of merchantability claims. However, it found that Syntex had breached express warranties as well as the implied warranty of fitness for a particular purpose. The court denied punitive damages but found that CRS had effectively revoked acceptance of the scanner. It therefore awarded CRS recovery of $226,000, the amount paid on the contract. Syntex was awarded approximately $19,000 for unpaid service bills to be applied against the $226,000.

## DISCUSSION

1. *The Validity of CRS' Revocation of Acceptance*

The parties agree that, under the terms of the sales contract, California law governs the contract claims. The pertinent statutory provision, therefore, is Uniform Commercial Code § 2–608, which we set out in the margin.[1] The district court held

---

**1.** SEC. 2–608. REVOCATION OF ACCEPTANCE IN WHOLE OR IN PART.

(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or

that CRS "effectively revoked its acceptance," under U.C.C. § 2–608(2), 595 F.Supp. at 1511, in light of Syntex's repeated representations to CRS that it would "shortly" provide the promised upgrading of the System 60.

A substantial question exists as to whether CRS' reliance upon Syntex's promises of cure was reasonable after the offer of the 60-second device in January, 1978, and whether the attempted revocation in June was timely under § 2–608(2). However, we need not address this issue, for CRS continued to use the Syntex scanner for some 22 months after the letter of revocation. The continued use of goods is inconsistent with the seller's ownership and may be found to constitute an acceptance. U.C.C. § 2–606(1)(c).[2] If so, such use would be at odds with a revocation of acceptance and could be held to have invalidated an earlier attempt at revocation. *Gasque v. Mooers Motor Car Co.*, 227 Va. 154, 313 S.E.2d 384 (1984) (buyer cannot use automobile after revocation).

CRS argues, however, that continued use for a reasonable period of time to allow buyers to seek an alternative or to avoid substantial hardship may be allowed. *Minsel v. El Rancho Mobile Home Center, Inc.*, 32 Mich.App. 10, 188 N.W.2d 9 (1971) (use of mobile home for six weeks after revocation while searching for another dwelling held reasonable); *Fablok Mills, Inc. v. Cocker Machine & Foundry Co.*, 125 N.J.Super. 251, 310 A.2d 491 (1973) (continued use of machines reasonable where seller is only manufacturer and alternative is going out of business).

■■■ Even if CRS' view of the law is correct, its continued use of the System 60 was far longer than was reasonably necessary to acquire another scanner. There is no evidence that CRS even began the search for a new scanner until late 1978 or early 1979. Negotiations then broke down because the doctors declined to be personally liable on the contract for a new scanner, as they had been on the Syntex deal. The negotiations that led to the purchase of the Picker device apparently did not begin until October, 1979, delivery occurring in April, 1980. Acquisition of a scanner is a major decision calling for a period of deliberation, and delivery after placing the order may, as found by the district court, take up to one year. 595 F.Supp. at 1511. The district court found that CRS' continued use of the scanner was reasonable, *id.*, and "[t]he reasonableness of the buyer's use of a defective good after revocation is a question of fact for the [trier]." *Johannsen v. Minnesota Valley Ford Tractor Co.*, 304 N.W.2d 654, 658 (Minn.1981) (en banc). We reverse not because we disagree with the district court's factual findings, but because we believe it failed to apply the correct legal standard. Under the U.C.C., a buyer who revokes acceptance rather than relying solely upon an action for breach of warranty must begin the search for replacement goods with reasonable dispatch and may not put off purchase until a seller offers ideal financial terms. CRS' desultory search for another scanner simply

(b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

Since California has adopted the Uniform Commercial Code without significant change,

*see, e.g.,* Cal.Com.Code § 2608 (West 1964), we will use the more general citation form "U.C.C. § ___."

2. U.C.C. § 2–606(1)(c) provides:

SEC. 2-606. WHAT CONSTITUTES ACCEPTANCE OF GOODS.

(1) Acceptance of goods occurs when the buyer

. . . . .

(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

belies its revocation claim, much as the long delay in the hope of avoiding personal liability implies that CRS continued to use the Syntex scanner because continued use was more advantageous than the existing alternatives. CRS' extended use of the defendant's scanner thus invalidates the purported revocation of acceptance.

### 2. *CRS' Fraud Claims*

■ CRS cross-appeals from the district court's rejection of its fraud claims. In order to prove fraudulent inducement under New York law,[3] a plaintiff must prove "(1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury." *Brown v. Lockwood*, 76 A.D.2d 721, 730, 432 N.Y. S.2d 186, 193 (2d Dept.1980). Under New York law, fraud must be proved by clear and convincing evidence. *Accusystems, Inc. v. Honeywell Information Systems, Inc.*, 580 F.Supp. 474, 482 (S.D.N.Y.1984) (citing cases).

The district court characterized CRS' fraud claims as being based "upon representations as to the future development of new and improved features for the System 60." 595 F.Supp. at 1503. It viewed the relevant question of law as "whether Syntex, at the time of the contract, had a good faith belief that it could develop such features." *Id.* The court held that "[a]t worst, Syntex was guilty of misguided optimism," and did not have the requisite scienter for its representations as to the future to constitute fraud. *Id.* at 1503–04. "Syntex had good reason to believe that it would be able to produce improved features for the System 60 and to keep abreast of whatever future technological

advances occurred in CAT scanners." *Id.* at 1504.

On appeal CRS does not contest the district court's rulings with regard to Syntex's good faith belief in its ability to perform in the future. CRS claims, however, to have proved a misrepresentation of existing fact, based on statements by Syntex representatives that the System 60 unit seen by the CRS doctors at the VA Hospital in January, 1976 had "been 'working' as a 'whole body scanner,' but that 'minor technical problems' with the body capability had caused it to be 'take[n] off line.'" *Id.* at 1501. Because Syntex did not in fact operate the machine as a whole-body scanner until March, 1976 at the earliest, this proof might support a fraud claim.

We remand this portion of CRS' fraud claim to the district court for further findings. Fraud must be proved by clear and convincing evidence under New York law, and a trier of fact might well find CRS' initial acceptance of the waterbag scanner, extended reliance upon promises of cure, and use thereafter until April, 1980 inconsistent with fraudulent inducement in January, 1976. *See Sy-Jo Luncheonette, Inc. v. Marsav Distributors, Inc.*, 279 A.D. 715, 108 N.Y.S.2d 349 (1st Dept.1951) (per curiam), *aff'd*, 304 N.Y. 747, 108 N.E.2d 614 (1952). Some weight must be given, moreover, to the fact that the CRS doctors were not without familiarity with the technology involved.

### 3. *Conclusion*

The other findings and conclusions of the district court are affirmed for substantially the reasons given in its opinion. We hold that CRS' revocation of acceptance was invalid, and remand for further proceedings with regard to CRS' fraud claim. We also remand for a recalculation of damages for breach of warranty and, depending upon the district court's decision, fraudulent inducement.

---

**3.** Whereas California law governs the contract claims by agreement of the parties, the fraud claims may be governed by either New York or California law. We read the district court as holding that New York law applies, a ruling not challenged on appeal. 595 F.Supp. at 1503. However, the court also remarked that the issue was "academic," *id.* On remand, the district court is free to reopen this issue if in fact a dispositive ruling was not intended.